SUNRISE CONSTRUCTION COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sunrise Constr. Co. v. Commissioner
Docket No. 39499-85.
United States Tax Court
T.C. Memo 1987-21; 1987 Tax Ct. Memo LEXIS 21; 52 T.C.M. (CCH) 1358; T.C.M. (RIA) 87021; 8 Employee Benefits Cas. (BNA) 1081; January 12, 1987. *21 P deducted substantial amounts as payments to a voluntary employees' beneficiary association (VEBA), claiming exempt status under sec. 501(c)(9), I.R.C. Respondent determined that the plan did not qualify for exempt status because net earnings of the fund inured to benefit of P's sole shareholder. Held, the plan was not an exempt VEBA where (1) the amounts contributed far exceeded the amounts reasonable for the stated purposes of the contributions; (2) excess funds were invested at the direction of the shareholder in a nonfiduciary manner; and (3) terms of the organizing agreement were not honored upon termination of the plan. Contributions to the plan were therefore not deductible under sec. 162(a). William L. Lucas, for the petitioner. Gail K. Gibson, for the respondent. COHEN
MEMORANDUM OPINION COHEN, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Tax Year Ended
Deficiency
March 31, 1981
$19,828
March 31, 1982
245,349
March 31, 1983
327
After an agreement as to other adjustments, the issue for determination is whether petitioner is entitled to deduct $400,000 in the fiscal year ended March 31, 1982, and $221,000 in the fiscal year ended March *22 31, 1983, as contributions to a voluntary employees' beneficiary association (VEBA) (hereinafter "the Plan"). Respondent determined that the amounts were not deductible as ordinary or necessary under section 162 [1] because the Plan was not exempt under section 501(c)(9). All of the facts have been stipulated, and the stipulation is incorporated in our findings by this reference. At the time the petition was filed, petitioner was a corporation with its principal office located in Helena, Montana. Petitioner was incorporated on June 11, 1976, and thereafter engaged in the construction business, primarily in Montana. From August 28, 1978, through April 29, 1981, Thomas Battershell (Battershell) owned 500 percent of the stock of petitioner, and Terry Pipinich owned the other 50 percent of the stock of petitioner. On April 29, 1981, Terry Pipinich sold his stock in petitioner to Battershell for $200,000 plus other consideration. At all times material hereto, Battershell owned 100 percent of the stock of petitioner. At a meeting on March 31, *23 1982, petitioner's Board of Directors, composed of Battershell, his wife, and Gary Duval, adopted a resolution to create a VEBA for the fiscal year ended March 31, 1982, and to contribute $400,000 to a VEBA trust. Petitioner executed documents entitled (1) Voluntary Employees' Beneficiary Association for Employees of Sunrise Construction, Inc. Helena, Montana, Specifications, (2) Voluntary Employees' Beneficiary Association for Employees of Sunrise Construction, Inc. Helena, Montana, Plan, and (3) Voluntary Employees' Beneficiary Association for Employees of Sunrise Construction, Inc. Helena, Montana, Trust. On July 23, 1982, the Plan created by the foregoing documents applied for an employer identification number. The Plan thereafter filed Forms 990, Return of Organization Exempt from Income Tax, for fiscal years ended March 31, 1982, and March 31, 1983. As originally executed, the Voluntary Employees' Beneficiary Association for Employees of Sunrise Construction, Inc. Helena, Montana, Plan, at section 3.02(a) provided as follows: Insurance Contracts - If the Specifications provide for the purchase of Contracts, the Committee shall direct the Trustee to invest contributions and *24 accruals and earnings thereon in Contracts to the extent provided here at each Participant's entry and as necessary on any increase in his benefits. (a) If evidence of insurability is required, for Participants insurable at standard rates the Trustee shall purchase group of individual Contracts providing the benefit called for in the Specifications. (b) If evidence of insurability is required, the Participants found by the Insurer to be insurable only at substandard rates or with exclusions, the Contract may provide a graded benefit or contain exclusions. If the full benefit called for in the Specifications could be provided at additional cost and the Participant in writing agrees to pay that additional cost, the Contract shall provide the regular benefit. If the Participant does not wish substandard insurance, or if insurance is wholly unavailable from the Insurer, then the benefit shall be limited to an amount equal to the sum of premiums which would have been paid had the Participant been insurable at standard rates. On May 12, 1983, that section was amended to provide as follows: ADDENDUM TO VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION FOR EMPLOYEES OF SUNRISE CONSTRUCTION, *25 INC. It is specifically agreed by the undersigned parties that Section 3.02(a) is to be amended to specifically include investment in commodities. It is further agreed that nothing in this Addendum shall be deemed to limit the original agreement. The addendum was signed by Battershell and his wife as trustees of the Plan and by Battershell as the President of petitioner. On August 5, 1983, at an annual meeting of petitioner's Board of Directors, a contribution of $221,000 to the Plan was approved by Battershell, his wife, and their daughter, as directors of the corporation. Those same three individuals were elected officers of the corporation. Form 1024, Application for Recognition of Exemption Under Section 501(a) or for Determination Under Section 120, was filed with the Internal Revenue Service on behalf of the Plan. After requesting additional information, the Internal Revenue Service notified the Plan on October 11, 1983, that it did not qualify for exemption. That determination was explained as follows: The information submitted indicates that you were organized pursuant to a trust agreement executed on March 31, 1982, to provide benefits effective April 1, 1981, for eligible *26 employees of Sunrise Construction, Inc. (Company). Company-adopted specifications provide that full-time employees with one year of service as of your effective date or any plan anniversary date who are at least age 24, other than employees whose employment is governed by a collective bargaining agreement, are eligible for benefits. General organizational information is as follows: The Company appoints your trustee. The trustee has full investment management authority over your funds. The Company is also the Plan Administrator and appoints a committee to carry out its administrative duties. Your current trustees and committee members are Gary Duval, Thomas Battershell, and Louise W. Battershell. Mr. Battershell and his wife, Ms. Battershell, are the sole shareholders of the Company, each owning 50% of its stock. Mr. Battershell is also President of the Company, and Ms. Battershell, Secretary-Treasurer. The two are the directors of the Company. The Company has the right to amend or terminate the Plan and Trust at any time. On termination, the trust fund is to be distributed as directed by the Committee, in accordance with the Plan. The Plan provides that residual assets are *27 to be applied in one or a combination of the following ways, as selected by the Company: (a) to provide life, sick, accident, or other benefits or (b) to provide cash to participants in proportion to their compensation. In accordance with the specifications and information subsequently submitted, you provide employer-funded life benefits equal to three times the employees' annual compensation and disability benefits equal to the employee's compensation. Benefits are provided through a combination of insurance and self-funding. For your first two fiscal years, you received employer contributions of $520,000. After expenditures of $46,515 for the purchase of term life insurance, and the receipt of investment income, reserves of $544,429 were available for the payment of benefits or distribution on termination. Based on your application and the employment data you submitted, the following employees are eligible for your benefits: Employee
Compensation
Battershell T.
$450,000
Battershell, L.
58,300
Duval, G.
35,000
Young, W.
40,022
Section 501(c)(9) of the Code provides for the exemption from federal income tax of voluntary employees' beneficiary associations providing for the payment of life, *28 sick, accident, or other benefits to the members of the association or their dependents or designated beneficiaries, if no part of the net earnings of the association inures to the benefit of any private shareholder or individual. Section 1.501(c)(9)-4(a) of the Income Tax Regulations provides that no part of the new earnings of an employees' association may inure to the benefit of any private shareholder or individual other than through the payment of qualifying benefits. Whether prohibited inurement has occurred is a question to be determined with regard to all the facts and circumstances. Based on the information submitted, we have concluded that your net earnings inure to the benefit of Mr. Battershell. Due to the small number of participants and the large discrepancy between Mr. Battershell's compensation and that of the other participants, he is entitled to a dominant share of your benefits and on termination will receive a dominant share of your residual assets, whether in the form of continued benefits or a cash distribution. Based on the current salary and employment data you provided, his share is in excess of 75%. Further, through his ownership of 1/2 of the Company's *29 outstanding stock, with the balance owned by his wife, Mr. Battershell has effective control over the company. The Company in turn controls your benefit plan and trust, including trust investments, plan administration, the timing of trust termination, and the manner of distribution of residual assets on termination. The trust is thus used to accumulate funds primarily for the benefit of Mr. Battershell. Under these circumstances, you function primarily as an investment fund for the direct personal and private benefit of Mr. Battershell rather than to provide qualifying benefits for a group of employees. The information submitted to the Internal Revenue Service that Louise W. Battershell, Battershell's wife, was a shareholder was erroneous. As now stipulated by the parties, Battershell owned 100 percent of the stock. Although at least one nonfamily employee was named as a trustee for a short period of time, there is no evidence of functions performed with respect to the trust fund by anyone unrelated to Battershell. As adopted, the Plan contained the following provision: Fund Recovery - It shall be impossible for any part of the contributions under this Plan to be used for, or diverted *30 to, purposes other than the exclusive benefit of the Participants or their beneficiaries. (a) Any assets remaining in the Plan after satisfaction of all liabilities to existing beneficiaries shall be applied in one of the combination of the following, as selected by the Employer: (1) To provide, either directly or through the purchase of insurance, life, sick, accident or other benefits within the meaning of Section 4.02, pursuant to criteria which do not provide disproportionate benefits to officers, shareholders or highly compensated Employees, or (2) To provide cash to Employee-Participants in proportion to their Compensation. (b) Nothing herein shall be interpreted to prevent the return of excess insurance premiums, based on the mortality or morbidity experience of the Insurer to which the premiums were paid, to the Employer, Employee or other person or persons whose contributions were applied to such premiums. On December 31, 1983, after petitioner received notice of the Internal Revenue Service letter determining that the Plan did not qualify for exempt status, the Plan was terminated as of December 31, 1983. The remaining assets in the trust fund of the Plan were returned to *31 petitioner and reported as income on petitioner's corporate income tax return for the fiscal year ended March 31, 1984. The receipts and expenditures of the trust fund of the Plan during the period of its existence are summarized as follows: Year Ended
3/31/82
Initial contributions
$400,000 Insurance premiums and costs
( 48,249)
351,751 3/31/83
Contribution
221,000 Insurance premiums and costs
( 16,493)
Investment earnings (loss)
63,045 619,303 3/31/84
Investment earnings (loss) a
(289,502)
Value returned to Sunrise Construction
$329,801 Petitioner has the burden of proving that respondent's determination in the statutory notice is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner contends that the determination is inconsistent with respondent's regulations, sections 1.501(c)(9)-2 and (9)-4, Income Tax Regs., providing in pertinent part as follows: [Sec. 1.501(c)(9)-2(a)(2)(ii)] (ii) Generally permissible restrictions or conditions. In general, the following restrictions will not be considered to be inconsistent with 1.501(c)(9)-2(a)(2)(i) *32 or 1.501(c)(9)-4(b): * * * (F) The provision of life benefits in amounts that are a uniform percentage of the compensation received by the individual whose life is covered. (G) The provision of benefits in the nature of wage replacement in the event of disability in amounts that are a uniform percentage of the compensation of the covered individuals (either before or after taking into account any disability benefits provided through social security or any similar plan providing for wage replacement in the event of disability). * * * [Sec. 1.501(c)(9)-2(c)(3)] (3) Of employees. To be described in this section [as a VEBA], an organization must be controlled -- (i) By its membership, (ii) By independent trustee(s) (such as a bank), or (iii) By trustees or other fiduciaries at least some of whom are designated by, or on behalf of, the membership. Whether control by or on behalf of the membership exists is a question to be determined with regard to all of the facts and circumstances, but generally such control will be deemed to be present when the membership (either directly or through its representative) elects, appoints or otherwise designates a person or persons to serve as chief operating *33 officer(s), administrator(s), or trustee(s) of the organization. For purposes of this paragraph an organization will be considered to be controlled by independent trustees if it is an "employee welfare benefit plan", as defined in section 3(1) of the Employee Retirement Income Security Act of 1974 (ERISA), and, as such, is subject to the requirements of Parts 1 and 4 of Subtitle B, Title I of ERISA. [2] *35 * * * [Sec. 1.501(c)(9)-4] (a) General rule. No part of the net earnings of an employees' association may inure to the benefit of any private shareholder or individual other than through the payment of benefits permitted by sec. 1.501(c)(9)-3. * * * Whether prohibited inurement has occurred is a question to be determined with regard to all of the facts and circumstances, taking into account the guidelines set forth in this section. * * * (b) Disproportionate benefits. For purposes of subsection (a), the payment to any member of disproportionate benefits, where such payment is not pursuant to objective and nondiscriminatory standards, will not be considered a benefit within the meaning of sec. 1.501(c)(9)-3 even though the benefit otherwise is one of the type permitted by that section. *34 For example, the payment to highly compensated personnel of benefits that are disproportionate in relation to benefits received by other members of the association will constitute prohibited inurement. Also, the payment to similarly situated employees of benefits that differ in kind or amount will constitute prohibited inurement unless the difference can be justified on the basis of objective and reasonable standards adopted by the association or on the basis of standards adopted pursuant to the terms of a collective bargaining agreement. In general, benefits paid pursuant to standards or subject to conditions that do not provide for disproportionate benefits to officers, shareholders, or highly compensated employees will not be considered disproportionate. See sec. 1.501(c)(9)-2(a)(2) and (3). Petitioner argues: Respondent is asking the Court to adopt new VEBA benefit limitations and control requirements which are beyond those of the Code and regulations and would deny Petitioner's VEBA exempt status even though it complied with Section 501(c)(9) and the regulations which respondent has adopted. The Court should decline to do so. * * * Respondent argues that he is merely applying the express statutory language of section 501(c)(9), which exempts from taxation -- (9) Voluntary employees' beneficiary associations providing for the payment of *36 life, sick, accident, or other benefits to the members of such association or their dependents or designated beneficiaries, if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual. Respondent contends that the overriding consideration is inurement to the benefit of Battershell. Respondent argues, in the alternative, that petitioner's VEBA arrangement, i.e., the Plan, was illusory. See Citrus Orthopedic Medical Group, Inc. v. Commissioner,72 T.C. 461, 464-467 (1979). Petitioner argues, in effect, that formalistic satisfaction of the criteria set forth in respondent's regulations is sufficient to secure exemption, i.e., is a "safe harbor." We do not accept this interpretation. The specific provisions of the regulations on which petitioner relies merely avoid any implication that participation by a shareholder-employee in a VEBA is a per se disqualification of the Plan from exemption. VEBA's were administered for many years without interpretive regulations. See Anesthesia Service Medical Group, Inc. v. Commissioner,85 T.C. 1031, 1049-1051 (1985), on appeal (9th Cir., May 14, 1986). The regulations *37 do not narrow the requirements for eligibility for exempt status set forth in the statute. In any event, the deductions in question are limited by section 1.162-10(a), Income Tax Regs., as follows: (a) In general. Amounts paid or accrued by a taxpayer on account of injuries received by employees and lump-sum amounts paid or accrued as compensation for injuries are proper deductions as ordinary and necessary expenses. Such deductions are limited to the amount not compensated for by insurance or otherwise. Amounts paid or accrued within the taxable year for dismissal wages, unemployment benefits, guaranteed annual wages, vacations, or a sickness, accident, hospitalization, medical expense, recreational, welfare, or similar benefit plan, are deductible under section 162(a) if they are ordinary and necessary expenses of the trade or business. * * * The exempt status of petitioner's Plan, specifically in regard to whether prohibited inurement occurred, must be determined on the basis of the substance of the Plan and not its form. See Greensboro Pathology Associates v. United States,698 F.2d 1196, 1200-1201 (Fed. Cir. 1982); Grant-Jacoby, Inc. v. Commissioner,73 T.C. 700, 707-710 (1980), *38 and cases cited therein. We conclude that, in substance, the Plan was not adopted or operated as an employee benefit plan but was merely a separate fund controlled by petitioner's sole shareholder for his own benefit.The incidental coverage of other employees of the corporation appears to be merely a cost of securing the anticipated tax-exempt status. Thus the contributions to the Plan are not ordinary and necessary business expenses. Our conclusion is based on three primary factors, among the facts and circumstances apparent from the limited record. See section 1.501(c)(9)-2(a)(2)(i) and (c)(3) and sec. 1.501(c)(9)-4(a), Income Tax Regs.
First, the amounts contributed to the trust fund and deducted on petitioner's tax returns, $621,000, were almost 10 times the amounts actually paid out for insurance premiums and costs, $64,742. Responding to this point, petitioner merely states "apparently no consideration was given to any possible need for a reserve for future benefit costs." Petitioner, however, has presented no evidence as to the amount of a reasonable reserve. We have no evidence of the projected cost of obtaining insurance for participants in the Plan. One need not be *39 an actuary, however, to recognize that the amount contributed to the Plan far exceeds the amount reasonable or necessary for the expressed purpose of the Plan. Second, Battershell invested the excess funds of the Plan in speculative investments, not an appropriate exercise of fiduciary duty over a trust for the benefit of others.See 29 U.S.C. sec. 1104(a); Montana Code Ann. sec. 72-21-104 (1985); and Bogert, Trusts & Trustees, sec. 612 (2d ed. 1980) (prudent man rule). [3] Petitioner has failed to prove any reason for the investments chosen other than to accommodate special interests of Battershell. Third, after the Internal Revenue Service ruled that the Plan was not exempt, the assets of the Plan were returned to petitioner without regard to the terms of the Plan documents or the requirements of the applicable regulation, section 1.501(c)(9)-4(d), Income Tax Regs. *40 [4] *41 *42 Disregard of contractual documents is frequently cited as evidence that a transaction is without its intended effect for tax purposes. See, e.g., Falsetti v. Commissioner,85 T.C. 332, 351-355 (1985). Petitioner argues that the ultimate termination of the Plan cannot be considered as retroactively disqualifying the Plan from its inception. The conduct of petitioner and Battershell with respect to the Plan, however, is evidence of their original intention to maintain unlimited control over the Plan's assets and supports the conclusion that no bona fide transfer occurred for tax purposes. Compare Holman v. Commissioner,728 F.2d 462 (10th Cir. 1984). See also Citrus Orthopedic Medical Group, Inc. v. Commissioner,supra at 466-467, where we held that the potential for return of funds to the employer upon termination of a plan negated deductibility of contributions as amounts "paid or incurred" under section 162(a).
In summary, the simple rule applicable to this case is the one frequently cited from Gregory v. Helvering,293 U.S. 465 (1935), in which the Supreme Court concluded that what was done there, although in accord with the literal language of the statute, was mere artifice. Adapting the language to substitute the circumstances in this case for those involved in Gregory v. Helvering,supra, the rule is as follows: No doubt, a new and valid * * * [entity] was created. But that * * * [entity] was nothing more than a contrivance to the end * * * [of transferring property to the corporate shareholder]. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. When that limited function had been exercised, it immediately was put to death. In these circumstances, *43 the facts speak for themselves and are susceptible of but one interpretation. The whole undertaking, though conducted according to the terms of * * * [the applicable statute], was in fact an elaborate and devious form of conveyance masquerading as a * * * [VEBA], and nothing else. The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose. [Gregory v. Helvering,293 U.S. at 469-470.] The Supreme Court's opinion in Gregory v. Helvering,supra, has been relied on for a variety of purposes in a variety of transactions. See Moore v. Commissioner,85 T.C. 72, 103 (1985). The case before us, however, is one of those in which its application is directly analogous to its original context. The requirement of section 501(c)(9) that no part of the net earnings of a VEBA inure to the benefit of any private shareholder or individual is patently intended to prevent use of a VEBA as a private investment account for a person in Battershell's *44 position. Superficial compliance with the formalities cannot overcome the undisputed substantive facts. See also Knollwood Memorial Gardens v. Commissioner,46 T.C. 764, 791 (1966). Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
a. Commodity losses and decline in market value upon liquidation of mutual fund investments.↩
2. Sec. 3(1) of the Employment Retirement Income Security Act of 1974 (ERISA), codified as 29 U.S.C. sec. 1002(1) (1982), defines "employee welfare benefit plan" as follows: (1) The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 (other than pensions on retirement or death, and insurance to provide such pensions).
3. The stipulation, and thus the record, is sparse as to actual compliance with various fiduciary responsibilities imposed on trustees of employee welfare benefit plans by the Employee Retirement Income Security Act of 1974 (ERISA). See generally 29 U.S.C. secs. 1101-1114 (1982)↩. Because the burden of proof is on petitioner, omissions must bear against it.
4. Sec. 1.501(c)(9)-4(d), Income Tax Regs., provides as follows: (d) Termination of plan or dissolution of association. It will not constitute prohibited inurement if on termination of a plan established by an employer and funded through an association described in section 501(c)(9), any assets remaining in the association, after satisfaction of all liabilities to existing beneficiaries of the plan, are applied to provide, either directly or through the purchase of insurance, life, sick, accident or other benefits within the meaning of sec. 1.501(c)(9)-3 pursuant to criteria that do not provide for disproportionate benefits to officers, shareholders, or highly compensated employees of the employer. See sec. 1.501(c)(9)-2(a)(2). Similarly, a distribution to members upon the dissolution of the association will not constitute prohibited inurement if the amount distributed to members are [sic] determined pursuant to the terms of a collective bargaining agreement or on the basis of objective and reasonable standards which do not result in either unequal payments to similarly situated members or in disproportionate payments to officers, shareholders, or highly compensated employees of an employer contributing to or otherwise funding the employees' association. Except as otherwise provided in the first sentence of this paragraph, if the association's corporate charter, articles of association, trust instrument, or other written instrument by which the association was created, as amended from time to time, provides that on dissolution its assets will be distributed to its members' contributing employers, or if in the absence of such provision the law of the state in which the association was created provides for such distribution to the contributing employers, the association is not described in section 501(c)(9)↩.