WADE L. MOSER AND LYNN R. MOSER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Moser v. Commissioner
Docket Nos. 15862-85; 15863-85; 3253-86; 3254-86.
United States Tax Court
T.C. Memo 1989-142; 1989 Tax Ct. Memo LEXIS 142; 56 T.C.M. (CCH) 1604; T.C.M. (RIA) 89142; 10 Employee Benefits Cas. (BNA) 2509; March 30, 1989; As amended April 4, 1989 James L. Norris, for the petitioner. Jack Forsberg, Randall G. Durfee, and Joel A. Lopata, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiencies and additions to petitioners' Federal income taxes: Year
Deficiency
[2] Addition to Tax Sec. 6661 Wade L. and
1981
$ 13,826.00 -0-      Lynn R. Moser 1982
2,042.00
-0-      Gary A. and
1981
11,602.34
-0-      Cody K. Bahmiller 1982
1,956.00
-0-      Berkley B. and
1981
130,379.00
-0-      Cathoryn Strothman 1982
136,526.00
$ 13,653 1983
14,145.00
1,415    Fiscal Year
Deficiency
Inland Oil & Gas
Ended 8-31-82
$ 78,678.00 Corporation *149 In his notice of deficiency to petitioners Berkley B. Strothman and Cathoryn Strothman (the "Strothmans"), respondent also determined that they were liable for the increased rate of interest pursuant to section 6621(c)[3] for the years 1981 through 1983. In his answers in the cases of petitioners Wade L. Moser and Lynn R. Moser (the "Mosers") and petitioners Gary A. Bahmiller and Cody K. Bahmiller (the "Bahmillers"), respondent asserted that those petitioners were liable for the increased rate of interest under section 6621(c) for the 1981 and 1982 years. In an amendment to his answer in the Strothmans' case, respondent asserted an increase of $ 50,000 in their 1982 deficiency as an alternative position should the Court find for petitioners on the issue of whether an additional $ 100,000 is includable in the Strothmans' 1981 taxable income. Respondent's amended answer also asserted that the Strothmans were liable for additions to tax pursuant *150 to section 6661 greater than those determined in the statutory notice by the amounts of $ 32,979 and $ 2,121 for 1982 and 1983, respectively. Respondent's increases in the section 6661 additions to tax were merely the results of the amendment of section 6661 to increase the amount of the addition to tax to 25 percent; [4] no additional amounts of tax were asserted as being subject to section 6661. The issues for decision are: (1) whether Inland Oil and Gas Corporation is entitled to a $ 200,000 deduction for a contribution to its voluntary employee benefit association, and if not, whether the Strothmans received income taxable to them as a dividend in connection with that contribution; (2) whether the Strothmans also received an additional $ 100,000 dividend; (3) whether the individual petitioners are entitled to deductions with respect to sale/leasebacks of computer equipment; (4) whether the individual petitioners are subject to the increased rate of interest pursuant to section 6621(c); and (5) whether the Strothmans are liable for additions to tax pursuant *151 to section 6661. GENERAL FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. All of the individual petitioners resided in Bismarck, North Dakota, when the petitions in their cases were filed. Inland Oil and Gas Corporation ("Inland") was a corporation having its principal place of business at Bismarck, North Dakota, when the petition in its case was filed. Inland was incorporated in North Dakota on September 14, 1967, and Inland originally began as a service company, performing title service work on oil and gas properties for large oil companies. Inland later extended its activities into the drilling and operation of oil and gas wells. At all times since incorporation, Inland has used the cash basis method of accounting and had a fiscal year ending August 31. Petitioner Berkley Strothman ("Mr. Strothman" ) and petitioner Cathoryn Strothman ("Mrs. Strothman") are husband and wife. Petitioner Cody K. Bahmiller ("Mrs. Bahmiller"), petitioner Lynn R. Moser ("Mrs. Moser"), and Sandy Putnam (not a party to the instant case) are the Strothmans' daughters. Since Inland's incorporation, *152 Mr. Strothman has been its president, and the Strothmans and their daughters have constituted Inland's directors and officers. Inland's 1,000 shares of outstanding common stock have been owned as follows: Incorporation
11/14/77
through
through
As of
As of
As of
Shareholder
11/13/77
8/31/82
12/31/83
12/31/84
12/31/85
Mr. Strothman
500
320
312.5
302
290
Mrs. Strothman
500
320
312.5
302
290
Mrs. Bahmiller
-
120
125  132
140
Sandy Putnam
-
120
125  132
140
Mrs. Moser
-
120
125  132
140
Mesdames Bahmiller, Putnam, and Moser acquired all their Inland shares by gifts from the Strothmans. Inland filed its Federal income tax return for the year ended August 31, 1981 (the "1981 year"), as a corporation taxable under subchapter S of the Code. That return reported that Inland's taxable income was $ 1,779,367 -- more than triple the $ 519,581 Inland reported as taxable income in the preceding year ending August 31, 1980. The oil and gas industry in which Inland operates historically has been cyclical, going through periods of boom and bust, and the early 1980's were a boom period for the industry. *153 For the year ended August 31, 1982 (the " 1982 year"), the year in issue, Inland filed its tax return as a corporation taxable under subchapter C of the Code. Inland ceased to qualify for its 1982 tax year as a small business corporation for purposes of subchapter S because it issued 10,000 shares of Inland preferred stock, 5,000 shares each to Mr. Strothman and Mrs. Strothman, on August 27, 1982. On its 1982 tax return, Inland reported taxable income in the amount of $ 111,808 and a tax liability of $ 33,876. For convenience, our remaining findings of fact and our opinion will be grouped with respect to the issues to which they relate. Voluntary Employees' Benefit Association
FINDINGS OF FACT Since 1979, Inland's only employees have been the Strothmans and Sue Leingang ("Ms. Leingang"). Mr. Strothman has been employed by Inland as president at all times since Inland's incorporation. Mrs. Strothman was employed by Inland as office manager continuously from May 1979 until her employment was terminated in September 1986. Ms. Leingang has been employed by Inland as a bookkeeper/secretary at all times since February 1979. For Inland's fiscal years 1981 through 1986, *154 those employees received total compensation (salary plus bonus) from Inland as follows: Fiscal
Year Ending
Ms. Leingang
Mrs. Strothman
Mr. Strothman
8/31/81
$ 15,500
$ 24,900
$ 90,000 8/31/82
11,400  24,900  90,000   8/31/83
16,200  24,900  90,000   8/31/84
15,100  30,900  100,000  8/31/85
16,500  24,900  90,000   8/31/86
15,200  24,900  65,000   At all times while employed by Inland, those employees have been full-time, nonseasonal , nonunion employees of the corporation. Mr. Strothman was born on June 9, 1928; Mrs. Strothman was born on July 7, 1929; and Ms. Leingang was born on September 23, 1954. In 1982 Mr. Strothman met with Alton Nitschke ("Mr. Nitschke"), a certified public accountant associated with Charles Bailly & Company CPA's, and with John McSwaney ("Mr. McSwaney"), a chartered financial consultant and the president of John S. McSwaney & Associates, Inc., Insurance Brokers. Mr. Strothman met with Messrs. Nitschke and McSwaney to discuss estate planning for Mr. Strothman and his family and employee benefits planning for Inland. Among the suggestions of Messrs. *155 McSwaney and Nitschke was that a voluntary employees' benefit association be formed for Inland. In reliance upon that advice of Messrs. McSwaney and Nistschke, Inland adopted the Inland Oil and Gas Corporation Voluntary Employees' Beneficiary Association Plan and the Inland Oil and Gas Corporation Voluntary Employees' Beneficiary Association Trust (collectively the "VEBA") on August 31, 1982. At all times since the creation of the VEBA, the First Trust Company of North Dakota (the "trustee"), has served as the trustee for the VEBA, and Mr. Strothman has served as the plan administrator. The VEBA plan documents essentially provided for the following: (1) Membership in the VEBA would consist of all full-time salaried, nonunion Inland employees between the ages of 25 and 65 who had continuous service as an Inland employee for at least six months. Individuals whose customary weekly employment was less than 30 hours or whose customary annual employment was less than five months were not considered employees for purposes of the VEBA. (2) Members of the VEBA would be provided with death benefits, sick and accident benefits, and severance pay benefits. (3) A death benefit in the *156 amount of three times the member's annual salary would be payable to the member's beneficiary in the event of death while an Inland employee. (Although the plan did not so require, the contemplation of Messrs. Strothman and McSwaney was that the VEBA would purchase life insurance on the lives of the VEBA members to provide for the members' death benefits.) (4) The VEBA would provide members and their dependents with sick and accident benefits in the event of illness or personal injury. The amount of the sick and accident benefits would be as set forth in a medical insurance policy which the VEBA would provide for the members. (5) The VEBA would pay a severance benefit upon the member's disability, retirement, or termination of employment; however, a member would not be entitled to any severance benefit if the "member's termination of employment resulted from involuntary termination by [Inland]." (Emphasis supplied.) The amount of the severance benefit would be based upon the member's compensation for the year of termination and the member's years of service for Inland, as follows: Service
Benefit
1-5 years
1/2 x compensation
6-10 years
1 x compensation
11 or more years
2 x compensation
*157 (6) Inland would make contributions to the VEBA for each year sufficient to (i) "pay the premiums on Contracts maintained by the Trustee on the lives of Members and Dependent Members for purposes of providing a Death Benefit," and (ii) provide amounts to be available to pay for benefits other than those for which life insurance on the members was maintained. (7) The VEBA would be administered under the direction of a "committee" consisting of from one to three persons who would be appointed by and serve at the pleasure of Inland's board of directors. The committee would have, inter alia, all powers necessary to (i) determine all questions relating to eligibility for plan participation, (ii) compute and certify to the trustee the amount and kind of benefits payable, and (iii) authorize all disbursements by the trustee. (The plan documents referred to the committee also as the plan administrator and defined the term "plan administrator" to mean the committee. Mr. Strothman alone has served as the committee since formation of the VEBA.) (8) The trustee would have no duty, and no right, to compute any amount to be paid by it pursuant to the plan or to collect any sums from Inland. *158 The trustee also would have no duty to question directions from the committee. The trustee would incur no liability for any distribution made by it pursuant to the committee's written directions, and the trustee would be under no duty to inquire as to whether such distributions were pursuant to the provisions of the plan. (9) Inland would have the right, by action of its board of directors, to amend or terminate the VEBA at any time. No amendment could change substantially the powers, duties, or liabilities of the trustee without the trustee's approval, and no amendment could be made to allow any part of the VEBA assets to revert to Inland or be used or diverted for any purposes other than the exclusive benefit of the members. (10) Upon the termination of the VEBA, the trustee either (i) would apply the net assets of the trust to provide life, sick, accident, or other benefits, directly or through insurance purchase, to beneficiaries of the VEBA, or (ii) would distribute the trust assets to the VEBA members, but in either case, the assets of the VEBA were not to be applied so that they "result in unequal payment to similarly situated members or in disproportionate payments to *159 [Inland's] officers, shareholders or highly compensated Employees." In no event could any part of the VEBA assets revert to Inland or be used for or diverted to purposes other than for the exclusive benefit of the VEBA members. The VEBA filed an Application for Recognition of Exemption Under Section 501(a) with the Internal Revenue Service. After the Service returned the application because it was incomplete, the VEBA refiled its application and the District Director issued the VEBA a letter dated December 27, 1982, which determined that the VEBA was exempt from Federal income tax under section 501(c)(9). On August 31, 1982, Inland contributed $ 200,000 to the VEBA, and Inland took a deduction for that payment on its corporate income tax return for the year ending August 31, 1982. During its fiscal years ending in 1983, 1984, 1985, and 1986, Inland paid administrative expenses of the VEBA in the amounts of $ 1,179.45, $ 2,104.59, $ 2,324, and $ 2,465, respectively, but made no other contributions to or payments on behalf of the VEBA. Inland's $ 200,000 contribution to the VEBA for the 1982 year was based on calculations made by Mr. McSwaney to ascertain (1) the full amount *160 of all potential severance pay benefits, and (2) the life insurance and medical insurance premiums necessary to fund for one year the death benefits and the sick and accident benefits, as set forth below: SALARY
MULTIPLE
COST
Severance Pay
Mr. Strothman
$ 90,000
x
2    $ 180,000
Mrs. Strothman
24,900
x
1/2  12,500
Ms. Leingang
11,400
x
1/2  5,700
Total
$ 198,200
SALARY
MULTIPLE
COST
Life Insurance Premium
Mr. Strothman              $ 90,000
x
3
$ 14,918 Mrs. Strothman              24,900
x
3
2,357
Ms. Leingang              11,400
x
3
102
Medical Insurance Premium
Mr. Strothman              660
Mrs. Strothman              660
Ms. Leingang              1,714
Total premiums
$ 20,411 Messrs. Strothman, McSwaney, and Nitschke had decided on a $ 200,000 initial contribution, instead of the $ 218,611 required for total first-year funding, because they knew that the VEBA assets would generate income to fund much of the premiums' costs. Additionally, *161 they expected that Inland might make future contributions to the VEBA to fund any additional needs. In September 1983, Mr. Strothman, as the committee, authorized the trustee to invest a portion of the VEBA's funds in telephone equipment lease contracts, based on Mr. Strothman's understanding that telephone leases generated a higher return on investment than the assets theretofore held by the VEBA. The leases served to fund the installation of telephone equipment for commercial installations by a telephone installation company in the area named Teltec. Through the end of its 1986 fiscal year, the VEBA's receipts and expenditures were as follows: Fiscal Year Ended
Aug. 31,
Aug. 31,
Aug. 31,
Aug. 31,
Aug. 31,
1982
1983
1984
1985
1986
RECEIPTS
Contributions from Inland  $ 200,000
$ -0-   $ -0-   $ -0-   $ -0-   Interest Income -0- 18,360
5,119
2,863
4,986
Telephone Leaseback Income -0- -0- 11,843
19,546
17,848
TOTAL    $ 200,000
$ 18,360
$ 16,962
$ 22,409
$ 22,834
[5] EXPENDITURES Health Insurance Premiums $ -0-    $ 3,315 $ 3,902 $ 4,151 $ 4,424 Life Insurance Premiums -0- 18,315
15,772
13,075
3,904
Recording Fees -0- -0- -0- 229
155
Bad Debts-Telephone Leases -0- -0- -0- -0- 9,132
TOTAL    $ -0-    $ 21,630
$ 19,674
$ 17,455
$ 17,615
*162 The market values of the VEBA's assets as of the end of each of its first five fiscal years were as follows: Aug. 31,
Aug. 31,
Aug. 31,
Aug. 31,
Aug. 31,
1982
1983
1984
1985
1986
Cash, Certificates of
Deposit, and other Cash Equivalents $ 200,000
$ 180,066
$ 9,808  $ 26,151 $ 55,631 Common Stock
-   -   -   -   16,813
Collective Fund
-   8,853
9,621
11,546
13,696
Accrued Income
-   7,656
71
607
1,015
Telephone Leasebacks
-   -   174,149
159,635
115,228
$ 200,000
$ 196,575
$ 193,649
$ 197,939
$ 202,383
In September 1986, Mrs. Strothman's employment with Inland was terminated on account of the downturn in the oil industry. On October 7, 1986, Mr. Strothman wrote the trustee and advised that payments from the VEBA in the amounts of $ 2,200 per month, less withholdings, should be dispensed to Mrs. Strothman beginning on November 1, 1986. Such payments were intended to be pursuant to the severance pay benefit provided by the VEBA. In the notice of deficiency issued to *163 Inland on December 9, 1985, respondent disallowed $ 192,500 of the $ 200,000 deduction taken for Inland's contribution to the VEBA, asserting that "it has not been established that more than $ 7,500.00 was for an ordinary and necessary business expense, was expended for the purpose designated, or meets the requirements of * * * Section 404." The notice of deficiency made no reference to the tax-exempt status of the VEBA. On April 24, 1986, respondent sent the VEBA a letter proposing to revoke the VEBA's tax exemption under section 501(c)(9). Subsequently, after the filing of the petitions herein and the issuance of a January 1987 opinion in Sunrise Construction Co. v. Commissioner,T.C. Memo. 1987-21, affd. without published opinion 863 F.2d 886 (9th Cir. 1988), respondent revoked the VEBA's tax-exempt status on March 26, 1987. OPINION We begin our discussion of the deductibility of Inland's payment to the VEBA by noting that petitioner has argued, and respondent has conceded, that the question of whether the VEBA meets the requirements for exemption under section 501(c)(9) is not at issue in the instant case. Respondent argues that, regardless *164 of the VEBA's status as a tax-exempt organization, Inland's $ 200,000 payment was not an ordinary and necessary business expense, and as such is not deductible by Inland. Respondent bases his argument on his assertions that (1) the VEBA in substance was a private investment fund for the benefit of the Strothmans, and (2) the amounts contributed to the VEBA in August 1982 were in excess of the funds necessary for current funding and created an asset with a useful life extending past the end of that taxable year. Respondent also argues that Inland's contribution to the VEBA constituted a dividend to the Strothmans. Petitioners assert that because the terms of the VEBA were structured in accordance with all relevant regulations, an independent trustee was chosen to hold the VEBA's assets, the terms of the VEBA were followed in operation, and the amounts Inland paid to the VEBA were ordinary and necessary expenses, Inland is entitled to the entire $ 200,000 deduction under section 162 in fiscal 1982. Petitioners also assert that because the VEBA assets were owned by the trustee and because the Strothmans received no direct economic benefits from the VEBA during the years in issue, *165 the Strothmans had no taxable dividend on account of the VEBA. For the reasons set forth below, we agree with petitioners with respect to the VEBA issues. There is scant authority governing the deductibility of an employer's contribution to an employee benefit plan, such as the VEBA. During the year in issue, section 1.162-10(a), Income Tax Regs., provided the primary authority, as follows: [6]
Amounts paid or accrued within the taxable year for dismissal wages, unemployment benefits, guaranteed annual wages, vacations, or a sickness, accident, hospitalization, medical expense, recreational, welfare, or similar benefit plan, are deductible under section 162(a) if they are ordinary and necessary expenses of the trade or business. * * * *166 The parties have stipulated that Inland, a cash basis taxpayer, actually paid the $ 200,000 contribution to the VEBA during its fiscal year ending August 31, 1982. It also is clear to us that the severance benefit and sick and accident benefits contemplated by the terms of the VEBA plan constituted "dismissal wages" and "sickness, accident, hospitalization, medical expenses," contemplated under the regulation. Respondent has not suggested that the other benefit provided by the terms of the VEBA, the death benefit, is not a "similar benefit" as contemplated in the regulation, and we find that the VEBA's death benefit is a benefit contemplated by section 1.162-10(a), Income Tax Regs., since that regulation is not meant to prescribe an exclusive list of appropriate benefits that a plan may provide. Anesthesia Service Medical Group, Inc. v. Commissioner,85 T.C. 1031, 1043 (1985), affd. 825 F.2d 241 (9th Cir. 1987). Respondent, however, asserts that the VEBA was an employee benefit plan in form only. He submits that the substance *167 of the VEBA was nothing more than a private investment fund created and operated for the benefit of the Strothmans. Respondent points out that the great majority, over 90 percent, of the costs of the insurance premiums paid by the VEBA and the costs of the full funding of the severance benefit were for benefits attributable to the Strothmans. Such a high percentage, however, is in line with the facts that (1) just over 90 percent of Inland's annual salary costs (the costs upon which the death and severance benefits are based) were for the salaries of the Strothmans, and (2) Mr. Strothman, a male in his mid-50's, was a greater life insurance risk and therefore more costlier to insure than the other VEBA members, who were female and, in Ms. Leingang's case, much younger. Furthermore, there is no statutory or regulatory provision which prohibits a deduction for a contribution to an employee benefit plan merely because a high portion of the benefits are attributable to one employee or a group of related employees. Cf. sec. 505(b), which generally denies tax-exempt status under section 501(a) to certain organizations, such as the VEBA, for years after 1984 if their benefits discriminate *168 in favor of shareholders or highly compensated employees, but which contains no provision requiring disallowance of a deduction for an employer's contribution to an organization having discriminatory plan benefits. Thus, we hold that the fact that the plan benefits are skewed in favor of the Strothmans is not a determinative factor in deciding the issue of deductibility of Inland's VEBA contribution. We likewise hold that the fact that the Strothmans, via their control of Inland, could effect amendments or termination of the VEBA is not determinative. The Strothmans' control of Inland did not allow them total unfettered control of the VEBA's assets. Although Mr. Strothman, as the committee, had significant input into the management of the VEBA's assets, the independent trustee was the actual titleholder of those assets, and it retained possession and exerted day-to-day control over the assets. As the Federal Circuit has stated in regard to the deductibility of a closely held corporation's contribution to an employee benefit plan, We realize the [employer] could at any time terminate or alter the plan although the monies of the trust could never revert to or inure to the [employer's] *169 benefit. This minimal retention of control is not sufficient to make the benefits of the plan in any way illusory. Employers need to retain rights to alter or terminate plans to meet the changing needs of the employees and employer. This flexibility may be required with numerous types of plans including the medical, vacation and other welfare benefit plans specified by regulation. We hold that the critical inquiry is whether the funds in the plan may ever revert to or inure to the benefit of the company. [Emphasis supplied.] Greensboro Pathology Associates, P.A. v. United States,698 F.2d 1196, 1203 n. 6 (Fed. Cir. 1982). [7]
In Anesthesia Service Medical Group, Inc. v. Commissioner,85 T.C. at 1044, we noted that the critical inquiry in Greensboro *170 Pathology, i.e., whether the funds in the plan ever may revert to the employer, is integrally related to whether a plan is a "welfare or similar benefit plan" to which contributions are deductible under section 162. In the instant case, several provisions in the plan documents clearly prohibit the reversion of any funds to the employer. The VEBA's provisions in this regard are clearly in contrast to those of the plan at issue in Citrus Orthopedic Medical Group, Inc. v. Commissioner,72 T.C. 461, (1979), where the employer was entitled to the return of plan funds upon the failure of the plan therein to qualify the employer for deductions under the Code, and such a provision denoted that the employer never relinquished control of the funds and thus never paid or incurred any expenses which properly could be deducted. Moreover, the VEBA was operated in accordance with the plan provisions. The record contains no indication whatsoever that any VEBA assets ever were transferred to Inland or that any VEBA assets were diverted to any purpose other than as permitted by the plan. Even after respondent revoked the VEBA's section 501(c)(9) tax exemption, no VEBA assets *171 were transferred to Inland. In fact, the only transfer of VEBA assets to any party related to Inland was the payment of severance benefits to Mrs. Strothman after she left Inland's employ. Respondent suggests that those severance payments to Mrs. Strothman evidence the Strothmans' intent to maintain the VEBA as a private investment fund, based on respondent's assertion that the payments are directly contrary to the VEBA provision that "a member will not be entitled to such [severance pay] benefit if said member's termination of employment resulted from involuntary termination by Employer." Respondent alleges that Inland dismissed Mrs. Strothman, and that such a dismissal constituted an "involuntary termination" under the VEBA which disentitled Mrs. Strothman to any payment of severance benefits. We note, however, that the parties' stipulated as a fact that the VEBA made the distributions to Mrs. Strothman "as severance benefits." Moreover, the record contains little, if any, evidence that would allow us to determine that Mrs. Strothman's termination was the sort of involuntary termination which would not give rise to her right to receive severance benefit payments from the VEBA. *172 The language of the VEBA plan provisions is such that some latitude apparently is given to the committee and trustee, in that the plan provisions do not define specifically what does or does not constitute an "involuntary termination." In fact, our reading of the plan provisions indicates that those provisions reasonably may be interpreted so as to entitle Mrs. Strothman to the severance benefits she received. We therefore decline to find that the payments to Mrs. Strothman were made contrary to the stated terms of the VEBA. We also decline to make respondent's suggested finding that the VEBA's assets were invested to accommodate the Strothmans' individual interests, and not in a prudent manner. Respondent suggests that the telephone leasebacks in which the VEBA invested were a risky investment inappropriate for an employee benefit fund. The record contains no evidence to support such a suggestion and, in fact, tends to contradict respondent. Respondent specifically inquired about the risk of the telephone leases in his cross-examination of Arlene Poppe, the trust officer who administered the VEBA for the independent trustee, and Ms. Poppe responded as follows: Q: Do the telephone *173 leases held by the VEBA have a higher degree of risk than most of the assets administered by your trust department? A: I would have to say no. Moreover, the results of the VEBA's investment in the leases bear out petitioners' position that the leases were not inappropriately risky investments. For the year ending August 31, 1985 (the first full year after the VEBA invested in telephone leases), the rate of return on the leases was 11.8 percent (based on average value of leases at beginning and end of year). For the year ending August 31, 1986, the rate of return on the leasebacks, even after taking into account the bad debts incurred, was 6.3%. By means of comparison, the average applicable Federal rates [8] for those two 12-month periods were 9.99 percent and 7.87 percent, respectively. [9] Thus, the telephone leases, even after taking into account bad debts, slightly outperformed the average market yield of Treasury obligations. See sec. 1274(d)(1)(C)(i). In short, Ms. Poppe's testimony and the rates of return earned on the telephone leases convince us that, at least insofar as respondent's suggested finding is concerned, those leases were not the sort of imprudent, risky *174 investment in which an employee plan fiduciary should not invest. Rather, the VEBA's investments in telephone leases and certificates of deposits appear to us to contradict respondent's suggested finding in the instant case. [10]
In summary, we have found that the provisions of the VEBA in form comported with the authority governing an employer's deductions. In operation, the VEBA comported with those plan provisions and such authority. The benefits provided by the VEBA were commensurate with the salaries and ages of its members, and the VEBA's assets, which were prohibited from reverting to the employer or being used for any purpose other than the welfare of the members, did not revert *175 to the employer or any shareholder except as permitted pursuant to the plan provisions. Last, the plan assets were prudently invested. Such facts are in direct contrast to those of Sunrise Construction Co. v. Commisioner,T.C. Memo. 1987-21, affd. without published opinion 863 F.2d 886 (9th Cir. 1988), a case on which respondent relies. In Sunrise, the sole shareholder of the employer corporation and his wife were both the trustees and the plan administrators (with no independent third-party trustee or administrator) of the employer's plan, and the plan assets were invested imprudently in speculative, highly risky commodities. Additionally, the assets of the plan in Sunrise, in contravention of the terms of the plan documents, were returned to the employer upon the Commissioner's revocation of the plan's tax-exempt status. The Court in Sunrise found the employer's plan to be illusory, in substance not an employee benefit plan, and disallowed deductions for the employer's contributions to the plan. In the instant case, however, we find that the plan is not illusory, and we will respect the substance of the VEBA, insofar as the deductibility *176 of Inland's contribution is concerned. We next address respondent's argument that Inland's contribution to the VEBA was excessive so that a current deduction should not be allowed for the full amount. The Court in Sunrise based its denial of deductions and nonrecognition of the plan therein on an additional fact, besides those noted above, namely, the employer had made contributions to the plan and taken deductions in the total amount of $ 621,000, yet the plan had spent only $ 64,742 (10 percent of the employer's contributions) for insurance premiums and costs during the plan's 3-year life. Such facts arguably might be similar to those herein; [11] however, we do not believe that the facts of the instant case evince an excessive contribution amount. Petitioners argue that it was ordinary and necessary for Inland to contribute $ 200,000 to the VEBA because such a contribution would fund the VEBA fully (i.e., fund the severance benefit, as well as the insurance *177 premiums paying for the other benefits). According to Mr. McSwaney's computations and the terms of the VEBA, $ 198,200 would have been required to fund in full the total severance benefits already vested for Inland's employees (presuming no employee was involuntarily terminated). Inland contributed an amount slightly greater than that $ 198,200 in order also to pay the required insurance premiums for the death and medical benefits until the VEBA assets generated sufficient earnings on their own. Petitioners suggest that Inland fully funded the VEBA in 1982, rather than making a smaller initial payment and making subsequent annual contributions to fund the benefits, because of the worry that Inland might not have the financial wherewithal later to fund the plan annually if (as subsequently did occur) the oil industry should happen to turn downward and out of its then boom period. We note additional support for the necessity of full funding in Mr. Nitschke's unrefuted testimony that full funding of the VEBA would be an advantage in finding an independent trustee because "trust departments typically have a problem with taking something that is unfunded." [12]
*178 The earnings of the VEBA for its first four years approximated the costs of providing the health and life insurance to fund the death and sick and accident benefits. [13] Furthermore, the value of the VEBA's net assets after 4 years of operation approximated the original contribution. In short, the results of the VEBA's operations show that the original Inland contribution was an amount which provided for full funding of the severance benefits and generated income sufficient to fund the annual costs of providing VEBA benefits - no more, no less. The annual costs, at least for the VEBA's first three years, in fact were approximately as projected in Mr. McSwaney's preliminary calculations. Respondent nevertheless suggests that no deduction should be allowed in excess of an actuarially determined annual contribution amount. There is no authority, however, that requires contributions to a VEBA in 1982 to be based on actuarial calculations. Cf. sec. 419A(c), as applicable to post-1985 contributions; sec. 415(b). Instead, we think that the totality of the facts at hand show that $ 200,000 *179 was an ordinary and necessary amount to contribute to the VEBA. Thus, pursuant to section 1.162-10(a), Income Tax Regs., we hold that Inland is entitled to deduct the $ 200,000 contribution as an ordinary and necessary expense in its fiscal year ending August 31, 1982. By virtue of this holding, we also conclude that the Strothmans did not receive income taxable to them as a dividend on account of Inland's contribution to the VEBA. [14]
$ 100,000 Dividend
ADDITIONAL FINDINGS OF FACT For its year ending August 31, 1981, Inland had taxable income in the amount of $ 1,779,367 and made dividend payments from November 16, 1980, through August 31, 1981, in the total amount of $ 515,048. The difference between those sums - $ 1,264,319 - was the amount of Inland's undistributed taxable income ("UTI") [15] for its 1981 taxable year as of August 31, 1981. Taking into *180 account distributions on September 25, 1981, the shareholders' correct allocable shares of Inland's 1981 UTI was as follows as of August 31, 1981, and October 25, 1981: 8/31/81
Distributions
10/25/81
Mr. Strothman
$ 405,122.77  $ 39,185.74
$ 365,938.03  Mrs. Strothman
405,122.77
39,185.74  365,938.03
Cody Bahmiller
151,357.06
-         151,357.06
Sandra Putnam
151,357.06
-         151,357.06
Lynn Moser
151,359.06
-         151,359.06
$ 1,264,318.72
$ 78,379.48
$ 1,185,949.24
Except for a conceded $ 3,000 error on the part of Mr. and Mrs. Strothman, the shareholders reported subchapter S income from Inland on their 1981 individual income tax returns in the amounts shown above for UTI as of August 31, 1981. [16]
*181 On October 26, 1981, before the foregoing correct amounts of UTI had been computed, Inland's board of directors met (hereinafter the "meeting") and approved the "payout of undistributed taxable income for the year ending August 31, 1981," to Inland's shareholders in the following amounts: Mr. Strothman
$ 374,022.36  Mrs. Strothman
374,022.36
Cody Bahmiller
100,000.00
Sandra Putnam
100,000.00
Lynn Moser
100,000.00
$ 1,048,044.72
The approved amounts were not proportional to the shareholders' ownership interests in Inland. The board of directors also approved Mr. Strothman's proposal that the amounts distributed "be loaned back" to Inland for the purpose of general operations for a one-year period without interest. Such an action was not unusual in that Inland commonly borrowed funds from its shareholders. On that same day, October 26, 1981, Inland issued checks denominated "For Dividends" to the shareholders as follows: Berk Strothman
$ 324,022.36  Kay Strothman
324,022.36
Cody Bahmiller
121,508.38
Sandra Putnam
121,508.38
Lynn Moser
121,508.38
$ 1,012,569.86
Such payments were proportional to the shareholders' *182 ownership interests in Inland at that time, even though the check received by each of the Strothmans was for an amount $ 50,000 less than that approved at the meeting. The Strothmans loaned back to Inland amounts equal to the $ 324,022.36 distributed to each of them, [17] and entries to reflect those loans dated October 26, 1981, and October 28, 1981, were made in Inland's books of account for Notes Payable to Mr. Strothman and to Mrs. Strothman, respectively. An adjusting entry dated October 30, 1981, in the amount of $ 100,000 also was made in Inland's general journal to debit "Shareholder's Undistributed Taxable Income" and credit "Notes Payable - Shareholder." The explanation for that entry was "To set up proper amounts on Notes Payable to Berk & Kay." Corresponding entries in the amounts of $ 50,000 for each of the Strothmans were made in the notes payable subsidiary ledgers to reflect the October 30 general journal entry; however, it is not clear whether the entries in the subsidiary ledgers actually were made around the end of October 1981 or at some much later date. Inland never issued any notes to evidence those two $ 50,000 "loans." *183 On August 31, 1982, Inland issued a check payable to "Berk and Kay Strothman" in the amount of $ 100,000. The Strothmans immediately endorsed the check and Inland redeposited the $ 100,000 in its bank account. A notation in Inland's checkbook recorded the purpose of the check as "For Purchase of preferred stock RePayment of Loan." Inland reflected the issuance and redeposit of that check in its ledgers by decreasing "Notes Payable" for each of the Strothmans in the amount of $ 50,000, and by increasing "Preferred Stock" in the amount of $ 100,000. In September and October of 1981, six loan repayments by Inland to shareholders, in the total amount of $ 149,400.58, were debited in Inland's ledgers incorrectly to account number 551 - "Shareholders Undistributed Taxable Income," instead of to the appropriate account number 352 - "Notes Payable Shareholders." The errant entries were made by Inland's bookkeeper, Ms. Leingang, who has no formal accounting education. Even though Ms. Leingang had been Inland's bookkeeper since 1979, she had trouble distinguishing between the notes payable accounts and the UTI accounts and sometimes made errors in posting entries to those accounts. *184 In the notice of deficiency issued to the Strothmans, respondent increased the Strothmans' 1981 taxable income by $ 100,000 and gave the following explanation: The journal entry on the books of Inland Oil and Gas Corporation dated October 30, 1981, creating notes payable to you in the amount of $ 100,000.00 results in a distribution of property other than money in the tax year 1981. Such distribution is a taxable dividend under sections 301 and 316 of the Internal Revenue Code and is includible in your gross income under section 61 of the Code. OPINION We must decide whether the Strothmans received $ 100,000 of unreported dividend income either in 1981, when the accounting entries increasing the Strothmans' notes payable balances were made, or if not then, in 1982, when the $ 100,000 check was issued to the Strothmans, who endorsed it back to Inland and redeposited it forthwith into Inland's bank account. Respondent asserts that the action taken at the meeting evidences dividend distributions by Inland to each of the Strothmans in the amount of $ 374,022.36. Respondent contends that those dividend distributions each were made $ 324,022.36 in cash, *185 as evidenced by the checks issued to the Strothmans, and $ 50,000 in a corporate note, as evidenced by the several accounting entries. Respondent apparently concedes that the issuance of the two $ 324,022.36 checks constitutes a distribution [18] of money within two and a half months after Inland's 1981 year end, and as such, is treated as a distribution of UTI which was not taxable to the Strothmans by virtue of section 1375(d)(1) and (f). [19] Respondent argues, however, that the Strothmans' receipt of the two $ 50,000 "notes" (as reflected in Inland's accounting records) constitutes dividends because Inland's subchapter S status terminated effective August 31, 1981, and because the notes were not distributions of "money" which may relate back to the year ending August 31, 1981, under the provisions of section 1375(f). As such, respondent concludes, the notes constitute distributions out of Inland's earnings and profits for the year ending August 31, 1982, rather than out of the 1981 year's UTI, and are fully taxable to the Strothmans as dividends. Respondent also posits that, in the event the Court finds no $ 100,000 dividend distribution to the Strothmans during 1981, the Strothmans' *186 receipt from and endorsement to Inland of the $ 100,000 check dated August 31, 1982, constituted a dividend taxable to them in their 1982 taxable year. *187 Petitioners assert two grounds to contest the attribution of a $ 100,000 dividend to the Strothmans: "1) There was never a distribution of property to [the Strothmans], and 2) the October 30, 1981 journal entry increasing their notes payable was in error and never authorized by the corporation." Petitioners also suggest that because the shareholders included in their individual taxable incomes all of the UTI for Inland's 1981 fiscal year, the Strothmans should not be taxed on distribution in October 1981 of that UTI. Petitioners seem to recognize that in the event the Strothmans are found to have received a $ 100,000 distribution in October 1981, the distribution clearly is not "money" as contemplated in section 1375(f)(1). Petitioners, however, apparently do not appreciate that any distributions made in October 1981 are presumed to be from Inland's 1982 fiscal year earnings and profits, and that a distribution by a non-subchapter S corporation, which Inland was effective September 1, 1981, may be treated as a nontaxable distribution of UTI only as permitted in section 1375(f). Estate of Kirk v. Commissioner,70 T.C. 771, 774-775 (1978), *188 affd. 634 F.2d 1048 (6th Cir. 1980). [20] Thus, if we find that the Strothmans received a $ 100,000 distribution in October 1981, the distribution will be deemed to be out of Inland's 1982 fiscal year earnings and profits and not a distribution of 1981 UTI, because it was not a distribution of money. Attebury v. United States,430 F.2d 1162, 1168 (5th Cir. 1970); Stein v. Commissioner,65 T.C. 336, 341 (1975); White v. Commissioner,61 T.C. 763, 769-770 (1974); Clark v. Commissioner,58 T.C. 94, 103-104 (1972). Petitioners have the burden of proof on this issue. Rule 142(a). Respondent begins by citing several cases which he submits are support for the proposition that a shareholder of a closely held corporation has taxable income upon the declaration of a dividend, regardless of whether the dividend *189 has been distributed in cash. The Supreme Court, however, has stated that the general rule is that a dividend is income to a shareholder when the dividends actually are received, not when they are declared. Mason v. Routzahn,275 U.S. 175, 178 (1927). See American Air Filter Co. v. Commissioner,81 T.C. 709, 725 (1983). Further, in Bush Bros. & Co. v. Commissioner,73 T.C. 424, 438-439 (1979), affd. 668 F.2d 252 (6th Cir. 1982), we stated that the determination of when dividends are received is to be made as follows: Under section 1.301-1(b), Income Tax Regs., a dividend "shall be included in the gross income of the distributees when the cash or other property is unqualifiedly made subject to their demands." This issue is factual. Avery v. Commissioner,292 U.S. 210 (1934). Its determination is based upon three tests: (1) Shareholder's unrestricted, legal right to demand payment at *190 any time, (2) no agreement involving shareholders to defer payment and, (3) the ability of the corporation to fulfill the dividend. [Fn. refs. omitted.] 73 T.C. at 438-439. See American Air Filter Co. v. Commissioner, supra.[21]A shareholder has not received a dividend "merely because he has the authority to influence the actions of the corporation and the authority to withdraw funds; funds are not constructively received until the corporation takes the necessary action to set them apart for him." Jerome Castree Interiors, Inc. v. Commissioner,64 T.C. 564, 570 (1975). Petitioners assert that the accounting entries increasing the notes payable accounts by $ 100,000 were errors made by Ms. Leingang, and were not ratified or authorized by the corporation. Ms. Leingang, who still was an Inland employee at time of trial, testified that Loyd Orser, the public accountant for Inland and the Strothmans until 1982, provided her with the amounts *191 of the dividend checks and the appropriate accounting entries relating to the UTI for 1981. Respondent, however, suggests that Mr. Strothman supplied Ms. Leingang with the appropriate amounts for the dividends, including any amounts to be added to notes payable balances. Mr. Orser testified that he thought the journal entry increasing the notes payable accounts by $ 100,000 was in error; however, he generally denied having any recollection of providing Ms. Leingang with any information relating to the amounts of distributions or the appropriate accounting entries. Furthermore, the copies of Inland's notes payable subsidiary ledgers in evidence indicate to us that the $ 50,000 entries to increase the balances in each of the Strothmans' accounts, even though dated "10-31," actually were not entered into those ledgers until August 1982, when the preferred stock was issued to the Strothmans. The fact that entries were made to increase the balances in the notes payable subsidiary ledgers in August 1982, rather than to reverse the corresponding entry previously made in the general journal, indicates to us that the $ 50,000 additions to notes payable in effect were endorsed by Inland. *192 The balances in the Strothmans' notes payable accounts, without regard to the $ 50,000 entries in issue, were approximately $ 1,300 and $ 39,000, from May 1982 until November 1982. If Inland truly had not intended for the notes payable accounts to include the $ 50,000 additions, we think that the appropriate course of action should have been either (1) for the preferred stock to be issued for no more than $ 1,300 -- the lower of the Strothmans' two note balances at that time (without regard to the $ 50,000 in issue), or (2) if there were a reason for the preferred stock to be issued in the amount of $ 100,000, for the Strothmans to pay cash to Inland sufficient to make up the differences between the cost of the stock and the balances of each of their respective notes payable accounts. Neither course was followed, and such a failure could be interpreted as the corporation's endorsement of the accounting position reflected in its ledgers. Indeed, we think it plausible that the course of events was as follows: the $ 100,000 notes payable general journal entry was made in late October or early November of 1981 to reflect the difference between the dividend declared at the meeting *193 and the actual checks written to the Strothmans, [22] but no corresponding entries were made at that time in the Strothmans' accounts in the subsidiary ledgers; several months later, during the process of issuing the preferred stock to terminate Inland's subchapter S election in August 1982, it was noticed that entries had not been made in the Strothmans' subsidiary notes accounts to reflect the earlier $ 100,000 general journal entry; and such entries then were made in the subsidiary ledgers at the same time that entries were made to transfer $ 100,000 from the Strothmans' notes payable balances to the preferred stock account. Continuing the scenario, we also think it plausible that the Strothmans and their accountants did not pay close attention to the additions to the notes payable account because they assumed, albeit incorrectly, that the increases to those accounts were simply nontaxable distributions of the 1981 UTI. Although we may not be convinced of such a scenario, the more pertinent point is that petitioners, who have the burden of proof on this issue (Rule 142(a)), have failed to convince us that the accounting entries truly were errors which were unknown to and never *194 ratified by Inland and its controlling shareholders. Such a scenario is supported by the fact that the payout approved at the meeting for each of the Strothmans, $ 374,022.36, was exactly $ 50,000 in excess of the amount of the dividend check written to each of them on that same day. The $ 50,000 difference between the amounts approved at the meeting and the amounts *195 of the checks should have been noticeable to an experienced businessman like Mr. Strothman, especially considering that he and Mrs. Strothman received the checks so proximately to the time of the meeting. [23] Additionally, as we noted above, no actions were taken to amend the entries at the time the preferred stock was issued, even though such entries, if errant, still could have been corrected at that time. Moreover, on these facts, the $ 100,000 check must have been for the purpose of satisfying the notes payable account balances and the endorsement of the check must have been for the purpose of satisfying payment for the preferred stock -- such purposes comport with the notations on the face of the check. Any other interpretation of the events would result in there having been no payment for the preferred stock, and petitioners have not suggested that the preferred stock was issued as a stock dividend. In short, petitioners have failed to prove that the accounting entries were errors, and we find that the 1981 entry crediting the Strothmans with notes payable in the amount of $ 100,000 was not in error. *196 Having found that Inland's general journal entry was not in error, we now turn to the terms set forth in Bush to decide whether any property was distributed to the Strothmans. First, all indications are that Inland had the ability to fulfill the disputed $ 100,000 dividend. Inland's cash balance at August 31, 1981, according to its tax returns, was approximately $ 1.4 million, well in excess of the amount necessary to pay in full the dividends to the shareholders, and we have seen no indication that Inland depleted that cash significantly for any purpose other than dividends in the two months between that time and the end of October 1981. Next, we also think that the Strothmans had the legal right to demand payment of the $ 100,000 to them at any time. The declaration of the dividend at the meeting should be sufficient to support such a demand, and we have seen no indication that any other action was taken which would limit or neutralize the declaration at the meeting. Last, we see no evidence of any cognizable agreement involving deferment of payment of the dividends. Although the record of the meeting shows that the board of directors approved the shareholders' loaning *197 back to the corporation the amounts of the declared dividends for a one-year period, the Strothmans did not adhere to such an agreement. Within six months after the meeting, Mr. Strothman and Mrs. Strothman had been repaid approximately $ 323,000 and $ 278,000, respectively, of the amounts of the 1981 UTI they loaned Inland. Additionally, the $ 100,000 check that was exchanged for the preferred stock was drawn to the Strothmans in August 1982, only ten months after the date of the meeting. Such repayments indicate to us that the so-called agreement approved at the meeting was devoid of substance and that, in effect, the funds were distributable merely upon the demand of the Strothmans. We therefore find that, in accordance with the tests set forth in Bush, the amounts of the dividends (as declared at the meeting) were subject unqualifiedly to the demands of the Strothmans, and that petitioners have failed to prove that the Strothmans did not receive a distribution when entries dated October 1981 were made to reflect the increase of the notes payable accounts. Accordingly, we hold that the Strothmans received a $ 100,000 distribution in 1981 from a corporation taxable under *198 subchapter C and that the provisions of section 1375(f) do not apply to treat such a distribution as a distribution of Inland's 1981 UTI. [24]
Computer Equipment
ADDITIONAL FINDINGS OF FACT Finalco, Incorporated ("Finalco") is the principal subsidiary of Finalco Group, Inc., a publicly-held corporation having its principal offices in McLean, Virginia. During the years in issue, Finalco was a closely-held corporation. Blackwood Corporation ("Blackwood") is a sister corporation to Finalco. During the years in issue, Finalco engaged in leasing transactions involving computer equipment in which Finalco negotiated and entered into leases with end-users, purchased the equipment, financed the purchase with a lending institution, and then resold the equipment in a sale and leaseback transaction with third parties. In addition to generating transactions through its own marketing programs, Finalco also acquired equipment subject to existing end-user leases from other leasing companies. Lease *199 Pro, Inc. ("Lease Pro"), is a Montana corporation engaged in the purchase, sale, and leasing of computer equipment. During 1981 and 1982, Lease Pro was owned by J. L. Dubois and Dean Schennum. Messrs. Dubois and Schennum are also the principals in Dubois-Schennum Associates, Ltd. ("DSA"), a Montana corporation organized in August of 1980, and registered with the National Association of Securities Dealers for the purpose of acting as a broker-dealer. During the years in issue, Lease Pro had no shareholders, officers, directors, or employees in common with Finalco Group, Inc., or its affiliates or subsidiaries. Comdisco, Inc. ("Comdisco"), a publicly-held Delaware corporation, is an equipment leasing company that buys and sells new and used computer equipment and arranges leases on such equipment. During the years in issue, Comdisco had no shareholders, officers, directors, or employees in common with Finalco Group, Inc., or its subsidiaries. In a purchase agreement dated September 30, 1981, Comdisco sold used computer equipment to Blackwood subject to existing liens and leases (the "Comdisco agreement"). The Comdisco agreement stated that the fair market value of the equipment *200 was $ 3,537,563 and that the purchase price was $ 3,550,000, payable in the form of three recourse promissory notes, each in the principal amount of $ 129,710.67, with the remainder amount of $ 3,160,868.39 to be paid solely from the rental fees due from the users of the equipment. Blackwood agreed to assume Comdisco's obligations under the existing liens outstanding on the equipment in the amount of $ 3,160,868.39. Comdisco warranted that all of the debts assumed were nonrecourse and that the debts would be amortized in full through the proceeds generated by the rental of the equipment. Additionally, the Comdisco agreement gave Comdisco the right to refinance or increase the debt secured by the equipment so long as the debt so refinanced or increased did not exceed the rentals due from the leases of that equipment. Blackwood also agreed to enter into a Management and Remarketing Agreement with Comdisco, which it did on the same date, September 30, 1981. In the Management and Remarketing Agreement, Comdisco agreed to act as Blackwood's agent to manage and remarket the equipment, in exchange for which Comdisco would be entitled to all of the proceeds from the equipment derived *201 from the re-lease or sale of the equipment prior to the expiration date of the applicable underlying leases. [25] After the expiration date of each particular underlying lease and until September 30, 1986, the expiration date of the Management and Remarketing Agreement, proceeds from the re-lease or sale of the equipment were to be apportioned 15 percent to Blackwood and 85 percent to Comdisco. After September 30, 1986, Blackwood was entitled to 100 percent of the net re-lease or sale proceeds unless Comdisco remarketed the equipment before September 30, 1988, in which event Comdisco was to receive 25 percent of such proceeds. By an agreement dated October 1, 1981, Blackwood assigned to Finalco its interest in the agreements with Comdisco, and Finalco agreed to assume all of Blackwood's liabilities under the agreements with Comdisco. Included among the property acquired by Finalco/Blackwood under the Comdisco agreement were several items of computer equipment manufactured by International Business Machines, Inc. ("IBM"), and under lease to Pershing & Company ("Pershing" and the *202 "Pershing equipment"). Pershing is a division of Donaldson, Lufkin & Jenrette, Inc., a large investment management and brokerage company whose shares were traded on the New York Stock Exchange. The lease with Pershing had a commencement date of August 22, 1981, and an expiration date of August 31, 1984, and called for Pershing to make 36 monthly rental payments, each in the amount of $ 27,385. The Comdisco agreement allocated to the Pershing equipment a sale price of $ 861,137.95 and a fair market value of $ 878,075. Comdisco originally had purchased the Pershing equipment from Atlantic Richfield Company on October 19, 1978. The Pershing equipment was the sole collateral for a note owed by Comdisco to C.I.T. Corporation ("C.I.T." and the "C.I.T. note"). The C.I.T. note was dated August 1, 1981, was in the principal amount of $ 781,675.21, bore interest at 15.75 percent, and was repayable in 36 monthly installments of $ 27,385 each from September 1, 1981, through August 1, 1984. The C.I.T. note was nonrecourse to Comdisco; i.e., C.I.T. could look only to proceeds from the equipment for repayment of the note absent a breach of Comdisco's representations or warranties. Petitioners' *203 Purchases
By three sets of agreements dated December 8, 1981, Lease Pro purchased the Pershing equipment from Finalco, and those agreements contemplated that petitioners would acquire the computer equipment from Lease Pro. The sum of the stated purchase prices to Lease Pro under the agreements was $ 878,076 -- one dollar greater than the fair market value assigned to the Pershing equipment by the Comdisco agreement. Terms for payment of the $ 878,076 aggregate purchase price were $ 20,260 in cash, three Promissory Notes and Security Agreements in the aggregate amount of $ 121,260, [26] and three Full Recourse Installment Promissory Notes (the "Finalco/Lease Pro notes") in the aggregate amount of $ 736,176. The Finalco/Lease Pro notes contain no provisions whereby Lease Pro's liability under those notes would be limited or on a non-recourse basis. Lease Pro agreed that its purchases of the equipment were made subject to any prior liens, encumbrances, and assignments. Although those agreements were dated so as to be effective December 8, 1981, there is no indication that they were finalized and signed before 1982. *204 Petitioners signed one-page agreements dated as of December 8, 1981, the same date as the Finalco/Lease Pro agreements, in which petitioners agreed to purchase from Lease Pro computer equipment which Lease Pro had purchased from Finalco as of that same date (the "one-page agreements"). Petitioners knew that the equipment they were purchasing was IBM equipment leased to and used by Pershing, but they did not know at that time specific serial numbers or specific model numbers of the equipment. Before signing the one-page agreements, petitioners had received financial statements for Pershing and satisfied themselves that Pershing and Donaldson, Lufkin & Jenrette, Inc. were "substantial" and fiscally sound, but petitioners had not investigated the financial viability of Finalco or Lease Pro and were not yet aware of Comdisco's relationship to the Pershing equipment. The one-page agreements were signed by Mr. Strothman on November 25, 1981, and by Mrs. Moser on December 21, 1981. The date on which Mrs. Bahmiller signed the agreement for her and her husband is uncertain, but was on or about December 21, 1981. The one-page agreements provided that the total purchase prices from Finalco *205 to Lease Pro for each of the three transactions would be the same as the purchase prices from Lease Pro to petitioners; however, the form of consideration to be given in the Finalco/Lease Pro purchases differed slightly from the form of consideration to be given by petitioners to Lease Pro. Those respective considerations, using the descriptions set forth in the one-page agreements, were as follows: >100> >101> Full Recourse
Full Recourse
Cash
Promissory Note
Installment Note
Strothmans
Finalco/Lease Pro
$ 14,700
$ 84,200
$ 513,034
Lease Pro/Strothmans
15,000
86,000  --
Mosers
Finalco/Lease Pro
2,780
18,720  111,838  Lease Pro/Mosers
2,800
19,200  --
Bahmillers
Finalco/Lease Pro
2,780
18,720  111,304  Lease Pro/Bahmillers
2,800
19,200  --
Limited Recourse
Installment Note
Strothmans
Finalco/Lease Pro
--
Lease Pro/Strothmans
$ 510,934
Mosers
Finalco/Lease Pro
--
Lease Pro/Mosers
111,338  Bahmillers
Finalco/Lease Pro
--
Lease Pro/Bahmillers
110,804  Thus, the total prices for petitioners' purchases were: Strothmans - $ 611,934, Mosers - $ 133,338, *206 and Bahmillers - $ 132,804. The one-page agreements also provided that petitioners would lease the equipment to Finalco and receive from Finalco 96 fixed monthly rental payments in the amounts of $ 8,338.26 (Strothmans), $ 1,817.69 (Mosers), and $ 1,809.01 (Bahmillers), plus additional rent in the amount of 50 percent of "Net Rentals received by Finalco from underlying lease after the 72 month of [petitioners' leases with Finalco]" (i.e., after December 1987). The term "Net Rentals" was not defined further in the one-page agreements. At the time they signed the one-page agreements, petitioners also wrote checks payable to "Security Bank N.A. Lease Pro Inc. Trust Acct." in the amounts of their agreed down payments, and signed Escrow Instructions instructing a bank to pay Lease Pro the amounts of petitioners' cash down payments. The Escrow Instructions provided, however, that distribution of that cash to Lease Pro was contingent upon Lease Pro's purchase of computer equipment from Finalco, which in turn was contingent upon the availability of the equipment and upon the finalization of a lease agreement between Lease Pro and Finalco. In early 1982, subsequent to the signings *207 of the one-page agreements, petitioners each signed a Purchase Agreement, a Promissory Note and Security Agreement, and a Limited Recourse Promissory Note-Security Agreement. Those agreements do not show the dates on which they were signed, but all are backdated so as to have effective dates of December 8, 1981. The terms of those agreements in general comport with the terms of the one-page agreements, except as noted below. The Purchase Agreements, unlike the one-page agreements, contain schedules setting forth the specific models and serial numbers of the equipment purchased by the respective petitioners. The Purchase Agreements also state that the transactions are subject to (1) a Master User Lease between Comdisco and Pershing; (2) a Promissory Note and Security Agreement between Comdisco and a lender (identified in petitioners' accompanying Bills of Sale as C.I.T.); and (3) a Purchase Agreement, Promissory Note, and Management and Remarketing Agreement between Comdisco and Finalco (or a related company). The Promissory Note and Security Agreements (the "promissory notes") provide that principal amounts due thereunder were due in four annual installments, payable by December *208 31 of 1982, 1983, 1984 and 1985. The promissory notes also provide that petitioners were liable for interest on any unpaid balance at the rate of prime plus 2 percent which, as of the effective date of the agreements, translated into an initial interest rate of 17.75 percent for petitioners. Petitioners were personally liable for the payment of principal and interest on the promissory notes. The Limited Recourse Promissory-Note-Security Agreements (the "Limited Recourse notes") provide that petitioners are personally liable on the notes only to the following extent: Strothmans - $ 343,023; Mosers - $ 75,964; Bahmillers - $ 75,631. All additional amounts owed by petitioners under the Limited Recourse notes are specified to be non-recourse, so that Lease Pro may look solely to the equipment for payment of those amounts. The Limited Recourse notes call for 96 monthly payments of principal and interest with the first payment due by January 31, 1982, and the final payment due in December 1989. By Agreements of Lease also dated December 8, 1981 (the "lease agreements"), petitioners agreed to lease the Pershing equipment to Finalco for 96 months in exchange for fixed monthly payments *209 in the amounts set forth in the one-page agreements. In addition to the 96 fixed rental payments, the lease agreements also provided for petitioners to receive additional rent in the amount of 50 percent of the Net Rentals received by Finalco for rentals accruing after the 60th [27] month of the lease term (i.e., after December 1986). The lease agreements defined "Net Rentals" as follows: the rental payments paid to Lessee [Finalco] from and after the date hereof by a lessee under the Underlying Lease after deduction for sales, use or property taxes, maintenance (including installation charges), transportation, insurance and any other amounts payable to the Underlying Lessee as reimbursement of rent and other non-reimbursed expenses, as well as any amounts payable to brokers or intermediary persons or entities who may have been instrumental in arranging the initial lease transaction or who were involved in the original acquisition of the Equipment by Lessee or any amounts payable to Lessee's salesman (such amounts not to exceed industry standards). Such percentage of Net Rentals payable as additional Fixed Rent hereunder shall be payable solely out of and only to the extent Net *210 Rentals are actually received by Lessee from lessee [Pershing] under Underlying Lease * * *. In the event Lessee finances any such Net Rentals, [petitioners] shall be entitled to receive 50% of the proceeds of such financing in lieu of future Net Rental payments. By letters dated December 8, 1981, Finalco consented to Lease Pro's transfer and assignment to petitioners of the rights and duties relating to the Pershing equipment. By additional letters of that same date, Finalco also relieved Lease Pro of the obligation of delivering full recourse promissory notes for the Pershing equipment in exchange for the delivery to Finalco of petitioners' promissory notes. By way of other agreements of that date, petitioners assigned to Lease Pro their rights under the lease agreements to the fixed rental payments and instructed Finalco that those payments should be made directly to Lease Pro, so that Lease Pro could apply the payments against petitioners' Limited Recourse notes. The 96 fixed monthly rental *211 payments due under the lease agreements were equal in amounts both (1) to the monthly installments owed by petitioners on the Limited Recourse notes, and (2) to the monthly installments owed by Lease Pro on the Finalco/Lease Pro notes. Even though the total principals due on the Finalco/Lease Pro notes were different from the total principals due on the Limited Recourse notes, the monthly payments on each set of the notes were equal because the interest rates on petitioners' notes were set slightly higher than the rates on the Finalco/Lease Pro notes. [28] Thus, insofar as petitioners were concerned, no cash changed hands with regard to the fixed rental payments, Finalco/Lease Pro notes, and Limited Recourse notes, since the amount owed by each Finalco, Lease Pro, and petitioners equaled the amount each was due. Furthermore, there is no evidence that Finalco and Lease Pro took the effort to exchange offsetting checks. On May 27, 1982, DSA (Lease Pro's sister corporation) *212 sent petitioners the "completed documents on [their] computer lease program with Pershing and Company" to evidence the agreements made with respect to the Pershing equipment. At about the same time, petitioners received from Finalco projections of profit and loss and tax savings from their computer investment throughout the lease-term (the "projections"). The projections indicated that petitioners would realize a loss for tax purposes in each year 1981 through 1985 and taxable income in each of the years 1986-1989. The net anticipated results for the complete lease term, as set forth in the projections, are as follows: Strothmans
Mosers
Bahmillers
Net Tax Savings
$ 66,624 $ 14,555
$ 14,555
(based on a 50% tax rate) Total Cash Investment
133,250  29,110  29,110  (including projected interest)  The computer lease program has operated in accordance with the agreements and with petitioners' understanding from the onset. Attached as Appendix I is a general schematic summarizing the computer lease program (as included in a Private Placement Memorandum sent for promotional purposes by Lease Pro to each potential investor, with *213 our notations to identify the players). Petitioners have paid all amounts required of them under the agreements, as follows: Strothmans
Mosers
Bahmillers
Down payment
$ 15,000.00 $ 2,800.00 $ 2,800.00 Promissory note
86,000.00
19,200.00
19,200.00
Interest on promissory note
32,258.94
7,058.58
7,058.58
$ 133,258.94
$ 29,058.58
$ 29,058.58
Petitioners' payments of principal and interest on the promissory notes were made either directly to Finalco or at Finalco's instruction to Lincoln First Bank. In connection with petitioners' acquisitions of the Pershing equipment, Finalco paid Lease Pro or DSA commissions in the total amount of 10 percent of "investor's equity." For purposes of computing the commission, "investor's equity" included cash down payments plus the promissory notes. No commissions were paid based upon the Limited Recourse notes. Finalco paid commissions only as investors actually made payments -- whether down payments or payments on promissory notes. On April 21, 1986, Finalco sent petitioners unsigned Remarketing and Agency Agreements ("RAAs"), and asked petitioners to agree to the terms of those agreements *214 so as to give Finalco the authority as of January 1, 1989, to remarket the equipment. The terms of the RAAs provided that Finalco would be compensated for its services as agent in the amount of 10 percent of all lease, re-lease, sale, or disposal proceeds received in connection with the equipment. Petitioners did not sign the RAAs, based upon the advice of their attorney, who opposed the RAAs "in light of the Internal Revenue Service's position that the Remarketing Agreement basically deprives the investors of any ownership rights in the computer parts." The letter from petitioners' attorney to Finalco rejecting the RAAs also stated that Lease Pro was opposed to the RAAs and that the instant case already had been docketed by this Court. Subsequently, on February 9, 1987, Finalco sent petitioners letters (the "1987 letters") stating that it had completed negotiations with Comdisco regarding the Pershing equipment and that the underlying leases with the end-user [29] had been renewed for a 36-month term of October 1, 1985, through September 30, 1988. Finalco further stated that based on the "residual sharing terms with Finalco," petitioners were entitled to 50 percent of the income *215 for the 21 months remaining in the terms of the underlying leases -- January 1987 through September 1988. The 1987 letters stated that petitioners would receive the following amounts of Net Rentals over the remaining lease terms: Quarterly
Total Over
Payment
21 Months
Strothmans
$ 3,468.15
$ 25,433.10
Mosers
657.00
4,599.00
Bahmillers
548.10
3,836.70
The 1987 letters to the Strothmans and to the Bahmillers noted that three pieces of equipment in each investment portfolio had been returned by Finalco to "our warehouse" because those pieces had been determined to have no future remarketing potential. The letter to the Mosers contained no indication that any of their equipment was in "the warehouse." In apparent contrast to the 1987 letters, earlier letters from Finalco, dated April 8, 1985, had informed petitioners that certain pieces of their equipment were located in a warehouse whose address was given as "Comdisco Technical Services" in Parsippany, New Jersey. According to those 1985 letters, *216 items in the warehouse consisted of three pieces of the Strothmans' equipment, all different from their three items "in the warehouse" in 1987; one piece of the Bahmillers' equipment which was among their three items "in the warehouse" in 1986; and two pieces of the Mosers' equipment. For the years in issue, petitioners claimed income and deductions with respect to the Pershing equipment on their Federal income tax returns as follows: Strothmans
Mosers
Bahmillers
1981
Rental Income
$ 8,338   --    --   Depreciation
91,790 $ 20,001 $ 19,921 Interest Expense
5,161 --    --   Net Loss  (88,613)
(20,001)
(19,921)
1982
Rental Income
$ 100,059 $ 21,812 $ 21,708 Depreciation
134,625 29,334 29,217 Interest Expense
72,234 --    --   Net Loss  (106,800)
(7,522)
(7,509)
1983
Rental Income
$ 100,059 *
*
Depreciation
128,506 Interest Expense
22,124 Net Loss  (50,571)
In the statutory notices of deficiency, respondent disallowed deductions for petitioners' *217 claimed net losses from the Pershing equipment. The explanations given for disallowance of the deductions were (1) petitioners had not acquired the benefits and burdens of ownership of a true economic investment in the equipment, and (2) even if petitioners in fact acquired ownership of and an investment in the equipment, the investment did not "occur" until such time as petitioners began to participate in income resulting from a re-lease or sale of the equipment. In the Strothmans' statutory notice, respondent also asserted, as an alternative ground for disallowance, that the Strothmans were not at risk within the meaning of section 465 with respect to the equipment. In his answers in the cases of the Mosers and Bahmillers, respondent also asserted that deductions were not allowable to the Mosers and Bahmillers because they were not at risk. Expert Opinions
Petitioners and respondent each provided an expert witness to render estimates of the value of each item of the Pershing equipment as would have been predicted in December 1981 -- the time at which petitioners signed the one-page agreements and at which all the documents took effect. Ralph E. Page qualified as petitioners' *218 expert, and Esmond C. Lyons, Jr. qualified as respondent's expert. The experts provided estimated values as of December 1981; December 1986 (the time at which petitioners' rights to additional Net Rentals matured); and December 1989 (the time at which the lease agreements expired and final payment was due on petitioners' Limited Recourse notes). The aggregate values at each date for each set of petitioners' equipment given by Messrs. Page and Lyons are summarized as follows (in thousands of dollars): 12/81
12/86
12/89
Mr. Page
Mr. Lyons
Mr. Page
Mr. Lyons
Mr. Page
Mr. Lyons
Strothmans
$ 585  $ 525.5
$ 193  $ 104-231 $ 105.3  $ 18.5-101 Mosers
134.5
124    44.4
12-49  24.2  4-29.5
Bahmillers
127  121.5  41.9
26-53  22.9  5-27  Mr. Page also provided a forecast of estimated re-lease rentals from the Pershing equipment for the years 1987-1989. To compute the forecast rentals, Mr. Page began by multiplying the projected equipment value at December 1986 by 90 percent. Using that product as the present value of rental values, he next computed the monthly payments that would *219 be required to amortize that present value over three years at an interest rate of 13 percent. Mr. Page calculated the sum of the 36 monthly payments and offered that sum as his estimate of the total rentals from the equipment during the three years. After correction for purely computational errors, Mr. Page's methodology and computation of petitioners' forecast rentals is as follows: Strothmans
Mosers
Bahmillers
12/86 value
$ 193,050
$ 44,385   $ 41,910   90%
X.9    X.9      X.9      Product
173,745
39,946.50
37,719   Monthly payment to
amortize Product  $ 5,854.16
$ 1,345.96 $ 1,270.90  36 months
X36    X36      X36      Expected re-lease
amounts (rounded)  $ 210,750
$ 48,455 $ 45,752  Thus, Mr. Page's methodology included an interest equivalency factor as part of the total forecast re-lease rentals. Mr. Lyons did not address whether any re-lease rentals would have been forecast as of December 1981. The Private Placement Memorandum describing the lease program for potential investors had informed petitioners that opinions vary as to the long term value *220 of the Equipment. The Issuer is of the opinion that the cost of the Equipment will have market value equal to at least 25% of cost at the end of the [96-month Finalco] lease term. There can be no assurance that this or any value will exist or be realized at such time. OPINION The last issue for decision is whether petitioners are entitled to deductions for depreciation and interest expense arising from their investment in the Pershing equipment. Respondent argues that the sales to petitioners were shams and should be disregarded because they are without economic substance and because petitioners did not acquire the benefits and burdens of ownership. Respondent also argues in the alternative that petitioners' deductions should be limited pursuant to section 465 because petitioners were not at risk for the total purchase price. Respondent last argues that to the extent petitioners are entitled to deductions, none should be allowed for 1981 because the appropriate underlying documents were not executed until 1982. Petitioners, of course, disagree with respondent's contentions and assert that they are entitled to deductions as claimed on their tax returns. As we stated in *221 Larsen v. Commissioner,89 T.C. 1229, 1251-1252 (1987), on appeal (9th Cir. 1988): Taxpayers are generally free to structure their business transactions as they please, though motivated by tax-reduction considerations. Gregory v. Helvering,293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). However, it is well settled that a transaction entered into solely for the purpose of tax reduction, and which is without economic, commercial, or legal purpose other than the expected tax benefits, is an economic sham without effect for Federal income tax purposes. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 196; Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243 (1981). Nevertheless, the existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. Frank Lyon Co. v. United States, supra; *222 Estate of Thomas v. Commissioner,84 T.C. 412, 432 (1985). In the sale and leaseback context, we set forth a standard that the non-user-owner recipient of tax benefits must specifically establish that the entry into the transaction was motivated by business purpose to justify the form of the transaction, and that the transaction was supported by economic substance. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 201-203. n12 In Rice's Toyota World, Inc. we stated that the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 196. n13 n12 Carlson v. Commissioner,T.C. Memo. 1987-306. n13 The presence of business purpose does not entitle a transaction to be recognized for Federal tax purposes where objective indicia of economic substance indicating a realistic *223 potential for economic profit are not manifest. Cherin v. Commissioner,89 T.C. 986 (1987). Economic Substance
Our inquiry into business purpose and economic substance is inherently factual. Larsen v. Commissioner,89 T.C. at 1252. The focus of this inquiry, however, is to perform an objective analysis of the transactions to determine whether a realistic opportunity for economic profit existed exclusive of any anticipated tax benefit. Larsen v. Commissioner,89 T.C. at 1254. Our focus is on the realistic potential for profit at the time petitioners entered into the transactions. Gefen v. Commissioner,87 T.C. 1471, 1492 (1986). [30] We analyze the transactions as a prudent investor, but with the recognition that we cannot insist upon unreasonable demands for certainty. Larsen v. Commissioner, supra; Gefen v. Commissioner,87 T.C. at 1492. The computer leasing issue before us is similar to issues *224 before the Court in a number of other cases. Several of those cases, in fact, dealt with Finalco leasing programs: Larsen v. Commissioner, supra; Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985); Casebeer v. Commissioner,T.C. Memo. 1988-628, on appeal (9th Cir. 1988); Shriver v. Commissioner,T.C. Memo. 1988-627, on appeal (8th Cir. 1988); Moore v. Commissioner,T.C. Memo. 1988-626, on appeal (9th Cir. 1988); and Sturm v. Commissioner,T.C. Memo. 1988-625, on appeal (9th Cir. 1988). In those Finalco cases and in other computer leasing cases, the Court's ultimate decision as to whether a transaction possessed the requisite economic substance generally has turned on an evaluation of (1) the taxpayer's purchase costs for the computer equipment, (2) the equipment's fair market value at the time of the taxpayer's purchase, and (3) any potential for residual resale or rental proceeds. As is typical in computer leasing *225 cases, the parties herein rely on their experts to establish the equipment's fair market value at acquisition and its expected residual value. In this regard, we are struck most by the fact that even though Messrs. Page and Lyons are not in agreement on the proper method to employ for valuing the equipment, the final results ultimately reached by each expert are substantially in agreement. This agreement is most pronounced in the experts' valuations of forecast residual values at December 1986 and December 1989. In five of these six valuations of residual value, the value offered by Mr. Page is within Mr. Lyons' range of values, and we find that those five values given by Mr. Page were the most likely residual values as of December 1981. In the sixth instance, Mr. Page concludes that, as of December 1981, the expected December 1989 residual value of the Strothmans' equipment would have been $ 105,300, while Mr. Lyons offers a range of values from $ 18,500 to $ 101,000. Mr. Page's predicted value thus is only marginally outside of Mr. Lyons' range of values, and we find that the Strothmans' equipment would have been expected to have a December 1989 residual value of $ 100,000. *226 The experts are not quite so close in agreement on the values of the equipment at December 1981, but Mr. Page's values are higher than those of Mr. Lyons only by 11.3 percent (Strothmans), 8.5 percent (Mosers), and 4.5 percent (Bahmillers). The total of stated purchase prices for petitioners' equipment is $ 878,076, Mr. Page's December 1981 estimated total value for the equipment is $ 846,500, and Mr. Lyons' estimated total value is $ 771,000. Thus, the lower of the two valuations, Mr. Lyons', concludes that the total value of petitioners' equipment packages at time of purchase was approximately 14 percent less than the stated contract purchase prices. Mr. Lyons made his valuations by reference to his own lists of IBM equipment prices and to the "Blue Book," a price manual for used computer equipment which is published by Computer Merchants, Inc. and widely used in the industry. Mr. Lyons noted, however, that equipment such as petitioners' might be sold at a premium over the Blue Book prices because the equipment already was leased, installed, and in operation at the end user's premises; he described the Blue Book prices as being for equipment which would have to be relocated *227 and remarketed to find a lessee if the purchaser were not to be the user of the equipment. Such a lease premium is in accordance with our comments in Larsen v. Commissioner, supra at 1259, wherein we attributed "some degree of reasonable value to the fact that petitioner acquired an arranged computer lease transaction subject to an end-user commitment. Mukerji v. Commissioner, 87 T.C. [926, 965 (1986)]." Mr. Lyons testified on cross-examination that the generally accepted range for lease premiums on equipment like petitioners' is from 10 percent to 15 percent. He further testified that the 14 percent total premium (over Mr. Lyons' valuations) that petitioners paid for the equipment was "at the high end of the range for acceptable premiums," and that it would be reasonable to assume anywhere within the range. Thus, the testimony and valuations offered by Mr. Lyons indicate that, after taking into account a reasonable lease premium, the stated purchase prices for petitioners' equipment approximated the fair market value of the equipment. Moreover, petitioners' total stated purchase prices of $ 878,076 approximated the sale price and fair market value of *228 the equipment as set forth in the Comdisco agreement -- an agreement between two unrelated corporations apparently dealing on an arm's-length basis. For the foregoing reasons, we find that at the time of petitioners' entry into the Finalco transactions, the purchase prices for the Pershing equipment approximated the fair market value. [31]
The equipment's predicted residual value as of December 1989 would not be sufficient to allow petitioners to recoup their cash investments in the equipment, so we must examine petitioners' likelihood of receiving re-lease proceeds to decide whether the transactions were imbued with economic substance. Larsen v. Commissioner,89 T.C. at 1263-1264. In this regard, we are hindered by the failure on *229 the part of Mr. Lyons to address any potential for re-lease proceeds in his expert report. Mr. Lyons' only discussion of re-lease proceeds was his testimony with respect to Mr. Page's methodology for determining projected re-lease proceeds. Mr. Lyons testified that a rule-of-thumb in the computer industry is that the fair market value of computer equipment at any time generally equals about 90 percent of the lease revenue to be received in the next three years. Mr. Page used that rule-of-thumb in calculating his projected re-lease proceeds, but he also included in his estimate of total re-lease proceeds an interest factor to account for the time value of money over the 3-year period. Mr. Lyons stated that he had heard of people in the industry adding the interest factor to the 90 percent rule-of-thumb, but that most of the people in the industry that he knew did not include the interest factor. We need not decide whether to take into account the interest factor in the instant case, because estimated re-lease proceeds based upon the 90-percent rule alone, without the interest factor, are sufficient to imbue the transactions with economic substance. Messrs. Lyons and Page both *230 agree that the industry rule-of-thumb equates 3 years of rent proceeds with 90 percent of the fair market value of the equipment. Based upon Mr. Page's projected December 1986 values for the equipment (which we above found to be the most likely future values at the time of petitioners' entry into the transactions) and taking into account Comdisco's right to 25 percent of re-lease proceeds if the equipment were remarketed before September 30, 1988, we find that petitioners reasonably could have estimated re-lease proceeds during the 3-year period 1987-1989 (the period under the lease agreements during which petitioners were entitled to 50 percent of Net Rentals from Finalco), to be as follows: Strothmans
Mosers
Bahmillers
12/86 value
$ 193,050
$ 44,385
$ 41,910
times 90% (rule of thumb)
X.9
X.9
X.9
times 75% (for Comdisco fee)
X.75
X.75
X.75
times 50% (for Finalco fee)
X.5
X.5
X.5
TOTAL
$ 65,154
$ 14,980
$ 14,145
Thus, at the time of petitioners' entry into the transactions, the investments might have been expected to yield the following results: [32]
Strothmans
Mosers
Bahmillers
Petitioners' Economic Profit:
12/89 residual value $ 100,000
$ 24,210
$ 22,860
Re-Lease Proceeds 65,154   14,980  14,145  $ 165,164
$ 39,190
$ 37,005
Petitioners' investment:
Cash down payment, plus promissory note and interest thereon $ 133,250
$ 29,110
*231 Based on such results, we find that the transaction possessed objective economic substance, i.e., there was a realistic opportunity for economic profit that justified the form of the transactions. Mukerji v. Commissioner,87 T.C. at 964; Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 203. [33]
*232 Benefits and Burdens
We next must address respondent's assertion that petitioners did not acquire sufficient benefits and burdens of ownership to be regarded as owning the computer equipment. Our holding that the transactions possessed economic substance does not foreclose a finding that petitioners did not possess sufficient attributes of ownership. Larsen v. Commissioner,89 T.C. at 1266-1267. Whether the benefits and burdens of ownership of the Pershing equipment passed to petitioners is a question of fact which we must ascertain from the intentions of the parties as evidenced by the written agreements read in light of all the relevant facts and circumstances. Levy v. Commissioner,91 T.C. 838, 860 (1988), and cases cited therein. We are satisfied, however, that petitioners acquired the benefits and burdens of ownership of the Pershing equipment. In other cases, we have noted certain factors to be neutral in determining whether investors in computer *233 equipment possessed sufficient benefits and burdens of ownership: (1) the use of a net lease, (2) the use of nonrecourse liability, and (3) the absence of significant positive cash flow during the lease term because the rental income stream during the initial lease term equals the interest and debt payments due. Levy v. Commissioner,91 T.C. at 860; Larsen v. Commissioner,89 T.C. at 1267; Estate of Thomas v. Commissioner,84 T.C. 412, 433-436 (1985). Factors which are relevant to the issue of ownership include: (1) the investor's equity interest in the computer equipment as a percentage of the purchase price; (2) a useful life of the property in excess of the lease term; (3) the expectation of a "turnaround" point, after which the investor's deductions for interest and depreciation are less than income from the lease; (4) the potential for the investor to recoup at least his initial cash investment from the projected residual value of the equipment plus the cash flow generated by the rental or re-lease of the equipment; and (5) the *234 net tax benefits during the leaseback term being less than the unrecovered cash investment. Levy v. Commissioner,91 T.C. at 860; Larsen v. Commissioner,89 T.C. at 1267-1268. As a percentage of the total purchase price, petitioners' cash down payments and promissory notes were approximately 16.5 percent. Petitioners' initial equity investment approximately equals that of Mr. Mukerji in Mukerji v. Commissioner, supra, and exceeds that of the taxpayers in Frank Lyon Co. v. United States,435 U.S. 561 (1978), and Estate of Thomas v. Commisioner, supra, and other cases finding that taxpayers had acquired the benefits and burdens of ownership. Mukerji v. Commissioner,87 T.C. at 967-968. Second, the fact that the equipment was projected by the experts to have remaining value at December 1989 demonstrates that the equipment's useful life was in excess of the lease term expiring in 1989; the equipment certainly would not be expected to retain value after its useful life had expired. Third, petitioners encounter a turnaround point in 1985, after which time they would realize and *235 report taxable income during the last four years of the lease term. Fourth, as we have stated above, the projected residual value plus projected additional rents during 1987 through 1989 would allow petitioners to recoup their total cash investment. Last, although petitioners received tax savings during the early years of the lease term, their tax savings over the entire lease term (relying upon the projections' calculations, which assumed a 50-percent tax bracket and accurately have projected the taxable income or loss from the program's operation) are only approximately one-half of their out-of-pocket cash payments for the investments. Petitioners' computer transactions thus satisfy the standards applied in Levy, Larsen, Mukerji, Estate of Thomas, and other cases. Levy v. Commissioner,91 T.C. at 861. We therefore find that petitioners acquired significant benefits and burdens of ownership of the computer equipment, particularly the potential to realize a profit or loss on the sale or re-lease of the equipment. See Levy v. Commissioner,91 T.C. at 862. Accordingly, we hold that petitioners are to be regarded as the owners of the Pershing *236 equipment during the years in issue. At Risk
Respondent next asserts that petitioners are not at risk within the meaning of section 465 with respect to both the promissory notes and the Limited Recourse notes. Section 465 limits a taxpayer's loss deductions only to those amounts for which the taxpayer is at risk with respect to the activity. A taxpayer is at risk to the extent of any money and the adjusted basis of any property contributed to the activity. Sec. 465(b)(1)(A). A taxpayer also is considered to be at risk to the extent that he is personally liable for the repayment of amounts borrowed for use in the activity. Sec. 465(b)(2)(A). For purposes of the at-risk rules, however, amounts borrowed from any person having an interest in the activity (other than an interest as a creditor) are not considered to be at risk. Sec. 465(b)(3). Also, a taxpayer is not considered to be at risk with respect to amounts protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Sec. 465(b)(4). Equipment leasing ventures, *237 such as petitioners', are subject to the at risk rules. Sec. 465(c). A taxpayer will be regarded as personally liable for any particular debt obligation if he is ultimately, economically liable to repay the obligation in the event funds from the underlying investment are not available to repay the obligation. Levy v. Commissioner,91 T.C. at 863. In this regard, the critical inquiry is to identify the obligor of last resort, and the scenario that controls is the worst-case scenario, not the best case. Levy v. Commissioner, supra;Melvin v. Commissioner,88 T.C. 63, 75 (1987). The fact that other entities exist in the chain of liability with respect to a particular obligation does not detract from the at-risk amount of the investors who have the ultimate liability. Levy v. Commissioner, supra;Bennion v. Commissioner,88 T.C. 684, 695 (1987) (quoting Melvin v. Commissioner, supra at 75). "The critical inquiry should be who is the obligor of last resort, and in determining who has the ultimate economic *238 responsibility for the loan, the substance of the transaction controls." Bennion v. Commissioner, supra;Melvin v. Commissioner, supra (citing United States v. Raphan,759 F.2d 879, 885 (Fed. Cir. 1985)). The ultimate question therefore is, so to speak, where in the chain of liability does the buck stop? In the instant case, petitioners are the ultimate debtors with respect to the loans financing the Pershing equipment. During the years in issue, C.I.T. was the ultimate creditor with respect to the bulk of the amounts loaned. Petitioners' Limited Recourse notes (at least in substantial part) and promissory notes were recourse liabilities by their terms. Similarly, Lease Pro's notes to Finalco were recourse by their terms. The consideration given by Finalco/Blackwood for the acquisition of computer equipment under the Comdisco agreement, however, consisted of only approximately 11 percent recourse promissory notes (payable to Comdisco), while approximately 89 percent of the consideration took the form of assumption of nonrecourse liabilities from Comdisco. The C.I.T. note that financed Comdisco's purchase of the Pershing equipment, *239 which by its terms was nonrecourse, was one of the nonrecourse liabilities assumed by Finalco via the Comdisco agreement. By the terms of the Comdisco agreement, the Pershing equipment was allocated a purchase price of $ 861,137.95. Thus, application of the purchase terms of the Comdisco agreement to the stated purchase price results in Finalco's consideration for the Pershing equipment being $ 94,725 in the form of recourse promissory notes and $ 766,413 in the form of assumption of the nonrecourse C.I.T. note. That $ 766,413 attributable to the C.I.T. note approximates the principal balance on the C.I.T. note that would have been unpaid as of September 30, 1981, the date of Finalco's acquisition of the Pershing equipment. [34] Presuming that receipts from Pershing's lease were properly applied to pay down the C.I.T. note according to its terms, we calculate that as of December 8, 1981, the nominal date of petitioners' acquisition of the Pershing equipment, the unpaid principal balance on the C.I.T. note approximated $ 712,000. [35]
*240 We do not consider petitioners to be at risk to the extent there was outstanding liability on the C.I.T. note. Neither Comdisco nor Finalco was at risk on that note; C.I.T. could look only to proceeds from the sale or lease of the Pershing equipment for repayments of the note. In this regard, we consider only C.I.T. to have been ultimately liable, or at risk, for purposes of section 465, insofar as the amount of the C.I.T. note is concerned. We doubt that either Finalco or Lease Pro would be able to collect from petitioners for any claims arising under the Finalco/Lease Pro notes or Limited Recourse notes without first showing that it had been forced to pay on its liability to some other party in the chain of liability. The other entities in the chain, Comdisco and C.I.T., had no recourse rights that they could enforce against their successors in the chain of liability. To say that petitioners would have any ultimate liability on the obligation is to ignore the economic reality of the entire transaction. There would be no economic justification for enforcement of petitioners' nominally recourse liabilities where the other entities in the chain of liability had no corresponding *241 recourse liability. The resulting enrichment that Finalco would receive if such liability were enforced against petitioners thus would be without economic substance or reality. We believe the nominal structuring of petitioners' notes as recourse obligations in substance was only window dressing in an effort to avoid the provisions of section 465. [36] If the Limited Recourse notes had been structured as nonrecourse obligations, the economics of the transaction would be no different. Our conclusion is further bolstered by the fact that petitioners' liabilities under the Limited Recourse notes exactly offset the amounts of fixed rent they were due under the lease agreements. We recognize that the fact of such offsetting amounts, in and of itself, generally is neutral and does not disqualify debt obligations for at risk purposes. See Gefen v. Commissioner,87 T.C. at 1492, 1501-1503. [37] When taken together with the fact that the obligations owed in the chain of liability to predecessor parties (Comdisco and C.I.T.) were on a nonrecourse basis, however, the exact offset of the note *242 payments and fixed rentals loses its neutrality. Specifically, the combination of facts means that there is no entity to enforce any part of the Limited Recourse notes against petitioners on a recourse basis. Finalco certainly could not initiate and succeed in enforcing the Limited Recourse notes against petitioners because petitioners would have an equal, offsetting claim (for fixed rent) to assert against Finalco. As we implied above, we do not think Lease Pro could have obtained enforcement of the Limited Recourse notes in its favor without first having to pay Finalco. We thus find that as to the Limited Recourse notes, there is no creditor who stands able and fully prepared to enforce the terms of the putative recourse debt obligation "owed" by petitioners. See Bennion v. Commissioner,88 T.C. at 699. Petitioners in effect were immunized from any realistic possibility of suffering an economic loss on the Limited Recourse notes, even if the underlying transactions were not profitable. Levy v. Commissioner,91 T.C. at 863-864, and cited cases. Accordingly, we hold that petitioners are not at risk for the Limited Recourse notes during the *243 years at issue. [38]
With respect to petitioners' promissory notes, there were no nonrecourse terms at other links in the chain of liability to immunize and protect petitioners from economic loss. Respondent asserts, however, that petitioners were not at risk on their promissory notes until such times as petitioners actually made cash payments thereon. Respondent bases his argument on his contention that Finalco had interests in the computer transactions "other than as a creditor," and that under section 465(b)(3) any one of those interests causes petitioners not to be at risk *244 for their borrowed amounts because Finalco, not Lease Pro, is petitioners' true creditor. Respondent argues that Finalco, rather than Lease Pro, is the true creditor of petitioners' promissory notes because Lease Pro's presence should be disregarded on the ground that Lease Pro was merely a strawman inserted into the transactions' chain of title to avoid the limitations of section 465. [39] Even assuming, without deciding, that Lease Pro is to be disregarded for purposes of the at-risk rules, however, petitioners' losses are not limited by the interest-other-than-as-a-creditor provision because we find that Finalco did not have any such prohibited interest in the equipment. [40]
*245 Section 465(b)(3)(A) provides that "amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who has an interest (other than an interest as a creditor) in such activity." The at-risk limitation is to apply on the basis of the facts existing at the end of each taxable year. Sec. 465(a); Melvin v. Commissioner,88 T.C. at 73; Capek v. Commissioner,86 T.C. 14, 48 (1986); S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 86. Respondent contends that Finalco retained the following prohibited (non-creditor) interests in the Pershing equipment: (1) all income from the end-user lease during the first 60 months of the lease agreements; (2) 50 percent of the net rents during the 61st through 96th months of the lease agreements; (3) the right to refinance the "indebtedness for which the equipment was pledged as security" (presumably the C.I.T. note); and (4) the right to pledge the equipment as security for indebtedness incurred by Finalco.[41] Respondent does not suggest why *246 he believes Finalco's rights to refinance and to pledge the equipment as security are interests other than as a creditor, and we take respondent to have conceded that those rights possessed by Finalco are merely interests as a creditor in the activity. In his reply brief, respondent describes Finalco's right to share in rentals on the equipment as an interest in net profits. The term "interest in net profits" apparently is from section 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979), [42] a provision not cited by respondent which, as a proposed regulation, "carr[ies] no more weight than a position advanced on brief by the respondent." F. W. Woolworth Co. v. Commissioner,54 T.C. 1233, 1265-1266 (1970). See also Eller v. Commissioner,77 T.C. 934, 946 (1981). We nevertheless shall address the asserted interest in net profits because several cases have used a net-profits-interest test as a guideline for determining whether a creditor has a prohibited interest. Levy v. Commissioner,91 T.C. at 867, *247 and cited cases. *248 We first address respondent's assertion that Finalco had a right to all income from the end-user lease during the first 60 months of the lease agreements. During the years at issue, the monthly rental payments owed by Pershing ($ 27,385) equaled the monthly payments due on the C.I.T. note. Thus, any "interest" actually possessed by Finalco in all income from the end-user lease is hollow indeed during the years in issue, since all the income from the end-user leases must be paid over to C.I.T. Such a hollow "interest" on the part of Finalco certainly is not the sort of interest other than as a creditor which might cause Finalco "to disregard its rights [to enforce the promissory notes] in favor of protecting or enhancing [its] other interests" in the computer activity. See Bennion v. Commissioner,88 T.C. at 698. We therefore find that any right possessed by Finalco during the years at issue to "all income from the end-user lease" is not a prohibited interest within the meaning of section 465(b)(3). We also do not think Finalco's right to 50 percent of any additional net rentals it receives in months 61 to 96 is a prohibited interest. Respondent suggests *249 that Bennion v. Commissioner, supra, mandates a finding that Finalco's rights to the additional net rentals are a prohibited interest. The Court in Bennion found the taxpayers to be at risk on the debt in issue, and we therein stated that Matrix (the promoter/creditor therein comparable to Finalco in the instant case) held a prohibited interest in the net profits of the activity (see 88 T.C. at 698). We think the interest possessed by Matrix, however, is distinguishable from Finalco's interest in the additional net rentals. Matrix had the right under a remarketing agreement to share equally with the taxpayer and his co-investor in all proceeds in excess of $ 55,000 from the subsequent lease or sale of equipment. See 88 T.C. at 688. By our reading of the Bennion opinion, Matrix' right to those proceeds was not conditional upon any passage of time, i.e., Matrix would have been entitled to a share of the proceeds from a sale of the equipment occurring on the day after the taxpayer invested. Finalco's right to 50 percent of the additional net rentals was unlike Matrix' right because Finalco's right was not in effect until the *250 sixth year of petitioners' leases. During the years at issue, Finalco had no right to one half of the total net rentals. We therefore think the language in Bennion inapposite to the instant facts. Instead, we find that the interest retained by Finalco was more akin to that in Levy v. Commissioner,91 T.C. at 868, where we held that the creditor's rights were "too indefinite and tenuous to constitute a prohibited other interest under section 465(b)(3)." We accordingly find that, insofar as petitioners' promissory notes are concerned, Finalco did not possess any interest in the computer activity which constituted a prohibited other interest during the years in issues. We have seen no other grounds upon which to deny petitioners' being at risk on the promissory notes, and we hold that petitioners were at risk within the meaning of section 465 on the promissory notes. Dating of the Documents
Respondent last argues that petitioners did not acquire their interests in the equipment until the final documents were executed in 1982. Respondent in essence asserts that the one-page agreements, the only documents actually signed by petitioners before the end of *251 1981, are not sufficient to invest in petitioners any ownership interest during 1981. Respondent bases his argument primarily on the requirement of the statute of frauds that a document must be signed by all parties. See U.C.C. sec. 2-201. The documents relating to petitioners' acquisition of the computer equipment provide that they are to be governed by New York State law. In New York, The law is clear that oral contracts that come within the provisions of the statute are not void, but voidable; that if the Statute of Frauds is not timely interposed as a defense by the party to be charged or his successors in interest, it is waived; and that the Statute of Frauds is a personal defense which cannot be interposed by a third party. Dante v. 310 Associates, 121 A.D.2d 332, 503 N.Y.S.2d 786, 788 (1986). Petitioners and the other parties to the computer transaction chose to perform the one-page agreements, and no party to the agreements availed itself of any initial right that might have been available to forestall enforcement of the voidable one-page agreements. *252 Respondent cannot object to petitioners' agreements based on the statute of frauds; he, as a third party, has no capacity to void the agreements. [43]
At trial, there also was some suggestion that petitioners did not know until 1982 specific information about the equipment they had acquired. We do not think petitioners' lack of specific knowledge of the serial numbers of the equipment is sufficient grounds to cause them not to be considered as acquiring their interests in the equipment in 1981. On September 30, 1981, Finalco acquired the Pershing equipment from Comdisco, and the purchase documents set forth specific model numbers and serial numbers. The Pershing equipment remained in place and in use by Pershing through that sale and until well after petitioners had received all final signed documents in connection with their acquisition of the equipment. When petitioners agreed in December 1981 to acquire the Pershing equipment, there was no question as to what items and *253 models were included within the scope of that purchase. Petitioners may not have had specific knowledge as of that time, but the items had certainly been set aside and segregated from any pieces of equipment not purchased by petitioners. Specifically, petitioners' items were set aside by the fact of their location at Pershing and by the specific itemization in the Comdisco agreement of the serial numbers and model numbers of that equipment on lease at Pershing. In short, we do not think inappropriate Finalco's (or Lease Pro's) policy of using one-page agreements to close a deal and subsequently transmitting final signed copies of the full-text documents several months later. The one-page agreements were merely a method by which Finalco could bind investors into the acquisition of the computer equipment while allowing Finalco adequate time to draft and finalize the several required documents. We agree with the statement made in response to the Commissioner's questioning of Finalco's policy of dating documents in Larsen v. Commissioner,89 T.C. at 1276-1277: "Although certain pertinent documents were executed after the close of the taxable year, the ownership *254 interest attached and the equipment was placed in service during [the year in issue]." Such was also the case with petitioners, and we hold that they are to be treated as acquiring their interests in the equipment in 1981.[44]
Section 6621(c)
Respondent asserts that petitioners are liable for increased interest under section 6621(c) attributable to their investment in the Pershing equipment. Section 6621(c) provides for an increased rate of interest with respect to the portion of any substantial underpayment of tax attributable to tax motivated transactions. Section 6621(c)(3)(A)(ii) provides that any loss disallowed by reason of section 465(a) is attributable to a tax motivation transaction. We have concluded that petitioners' deductions are to be limited because *255 petitioners were not at risk under section 465 on the Limited Recourse notes. Accordingly, if the disallowed losses from the computer activity create an underpayment in excess of $ 1,000 for any of the petitioners for any year, the increased interest under section 6621(c) applies to such underpayment. Section 6661
Respondent also determined that the Strothmans were liable for additions to tax under section 6661 for 1982 and 1983. Section 6661(a) provides for an addition to the tax for any year [45] for which there is a substantial understatement of income tax. A substantial understatement is defined as an understatement which exceeds the greater of ten percent of the tax required to be shown on the return for the year or $ 5,000. Sec. 6661(b)(1)(A). The amount of the addition to tax is 25 percent of the underpayment attributable to a substantial understatement. Pallottini v. Commissioner,90 T.C. 498 (1988). To the extent there is or was substantial authority for the tax treatment of an item, however, any understatement attributable to such tax treatment reduces *256 the understatement for purposes of section 6661. Sec. 6661(b)(2)(B)(i); Antonides v. Commissioner,91 T.C. 686, 701 (1988). Petitioners have the burden of proof on the section 6661 additions. Rule 142(a). For the 1982 and 1983 years, the only deficiency we have found against the Strothmans is attributable to the computer activity. Thus, insofar as we can tell, the computer activity is the only item with respect to which the section 6661 additions to tax may be imposed. The extent of respondent's argument on the section 6661 issue is a one-sentence statement in his reply brief that the Strothmans "did not have a basis for a reasonable belief that the tax treatment of the computer leasing transaction is 'more likely than not the proper treatment.' Treas. Reg. Section 1.6661-5(d)." Respondent has not specifically asserted that the understatements are attributable to a tax shelter (see sec. 6661(b)(2)(C)), and he *257 has not addressed whether the Strothmans had substantial authority for the tax treatment of the computer equipment nor whether they adequately disclosed the facts affecting such tax treatment (see sec. 6661(b)(2)(B)). Petitioners also do not thoroughly address the applicability of section 6661 to the computer deductions. They do assert on brief, however, that if respondent is arguing that the equipment transaction was a tax shelter (within the meaning of section 6661(b)(2)(C)), they are not liable for the section 6661 additions because they had a reasonable belief that their position was more likely than not the proper tax treatment. See sec. 6661(b)(2)(C)(i)(II); sec. 1.6661-5(d), Income Tax Regs. Such an argument by petitioners implicitly presupposes an assertion that they also had substantial authority for their tax treatment; the statutory construction of section 6661 is such that the provisions of section 6661(b)(2)(C) and section 1.6661-5, Income Tax Regs., are merely an additional test that a taxpayer must pass in order to come within the section 6661(b)(2)(B)(i) substantial authority exception. Respondent has not *258 specifically argued that petitioners' computer activity is a "tax shelter" as that term is defined in section 6661. We take respondent's one-sentence statement in his reply brief as merely a general denial of petitioners' argument on brief, and we decline to read into respondent's briefs any specific assertion that the computer activity is a tax shelter within the meaning of section 6661(b)(2)(C). In that respondent has not made any unequivocal contention that the computer activity is a tax shelter, we thus consider respondent as having conceded any argument that the instant computer activity is a "tax shelter" within the meaning of section 6661. Petitioners therefore need to meet only the normal requirements of section 6661(b)(2)(B)(i) to avoid liability for the section 6661 additions to tax, not the additional provisions of section 6661(b)(2)(C) which apply only to tax shelters. In the instant case, we think petitioners had substantial authority for their position that they were entitled to deductions (and thus implicitly at risk) on the bases of their Limited Recourse notes. The *259 substantial authority standard of section 6661(b)(2)(B)(i) is not so stringent that a taxpayer's tax treatment must be treatment which ultimately is upheld in litigation or which has a greater than 50- percent likelihood of being upheld in litigation. Sec. 1.6661-3(a)(2), Income Tax Regs. We find that the totality of facts before us, especially the fact that petitioners' Limited Recourse notes and the Finalco/Lease Pro notes were recourse by their terms and the fact that petitioners' equipment reasonably was predicted to retain sufficient value for petitioners to be able to show a profit on their investment, are such that petitioners had substantial authority for their tax treatment. Cf. Antonides v. Commissioner,91 T.C. at 702-704. We therefore hold that petitioners are not liable for the section 6661 additions to tax. To reflect the foregoing, Decisions will be entered under Rule 155.
APPENDIX I (1) Bank lends funds to CLC (or its predecessor) to enable it to purchase the Equipment. Loan is payable over term of End User Lease and secured by first lien on Equipment and assignment of the End User Lease. End User leases Equipment *260 from CLC (or its predecessor) for a term generally equivalent to the term of bank loan with rental sufficient to pay off bank loan relating to the Equipment. (2) CLC sells Equipment to Seller, subject to the Bank Lien and End User Lease, for cash and full recourse note. (3) Seller sells Equipment to Investor for cash and limited recourse note. Term of limited recourse note is 96 months and is secured by lien on Equipment and CLC Lease. (4) Investor entered into a lease of the Equipment to CLC for a term of 96 months with rentals sufficient to amortize payments by Investor under limited recourse note. Investor may hire CLC to remarket Equipment when the lease with CLC is expired.
[SEE ILLUSTRATION IN ORIGINAL] Footnotes
1. Cases of the following taxpayers were consolidated for trial, briefing, and opinion: Inland Oil & Gas Corporation, docket no. 3253-86; Berkley B. and Cathoryn Strothman, docket no. 3254-86; and Gary A. and Cody K. Bahmiller, docket no. 15863-85. For convenience, and unless otherwise noted, we shall refer to the foregoing consolidated cases collectively as "the instant case."↩
2. All Code, subchapter, and section references are to the Internal Revenue Code of 1954, as amended and in effect during the relevant years, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Subsection (d) of section 6621 was redesignated subsection (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to section 6621↩ as redesignated and amended.
4. See Pub. L. 99-509, sec. 8002(a), 100 Stat. 1951; Pallottini v. Commissioner,90 T.C. 498↩ (1988).
5. The record contains no indication of any charges by the trustee for trustee fees.↩
6. Although inapplicable to the year in issue herein, sections 419 and 419A and sections 1.162-10T, 1.419-1T, 1.419A-1T, Temporary Income Tax Regs., 51 Fed. Reg. 4312↩ (February 4, 1986), provide additional rules with respect to deductions for an employer's contributions to a welfare benefit plan paid or accrued after December 31, 1985.
7. The primary issue in Greensboro Pathology↩ was whether the benefit plan was a deferred compensation plan and thus subject to section 404. Respondent asserted an issue under section 404 in the notice of deficiency herein; however, his briefs do not mention section 404 whatsoever, and we find that he has abandoned any issue with respect to section 404 in the instant case.
8. As defined in section 1274(d)(1) for short-term (less than 3 years to maturity) obligations. ↩
9. Using average of all months' rates for short-term obligations. See 1986-2 C.B. 147; 1986-1 C.B. 295-297; 1985-2 C.B. 186-189; 1985-1 C.B. 286-291; 1984-2 C.B. 181↩. 10. Respondent does not suggest that the trustee had any duty to invest the assets of the VEBA in a manner other than that in which it invested such assets.↩
11. Inland contributed $ 200,000 to the VEBA, and the VEBA's insurance premium costs totalled $ 58,530 (29 percent of Inland's contribution) during the VEBA's first three years, and $ 66,858 through August 31, 1986.↩
12. Several of the witnesses suggested that an additional reason behind Inland's institution and full funding of the VEBA was to provide an incentive to new employees which Inland had plans to hire. No such employees ever were hired by Inland and, although we might speculate that the subsequent downturn in the oil industry might be responsible, the record does not show fully why no new employees were hired.↩
13. Investment income, net of expenses, of $ 71,049; total premium costs of $ 66,858.↩
14. Respondent does not contend that the $ 200,000 contribution to the VEBA results in taxable income to the Strothmans by virtue of their positions as Inland employees or as beneficiary members of the VEBA under the provisions of the plan documents, e.g., as unreasonable compensation.↩
15. As in effect during 1981, section 1373(c) defined UTI as follows: (c) UNDISTRIBUTED TAXABLE INCOME DEFINED. -- For purposes of this section, the term "undistributed taxable income" means taxable income [of an electing small business corporation] minus the sum of (1) the taxes imposed by sections 56 and 1378(a) and (2) the amount of money distributed as dividends during the taxable year, to the extent that any such amount is a distribution out of earnings and profits of the taxable year as specified in section 316(a)(2)↩. 16. After rounding to the nearest dollar.↩
17. The record does not contain sufficient evidence for us to say for sure that the other shareholders loaned the amounts of their dividend checks back to Inland, but in any event, such facts are immaterial to our resolution of the instant case.↩
18. Respondent has not asserted that the issuance of the two $ 324,022.36 checks and the Strothmans' concomitant loaning of the same amounts to Inland did not constitute a distribution of money. See Roesel v. Commissioner,56 T.C. 14, 26 (1971); Prescott v. Commissioner,T.C. Memo. 1983-709. But see Oswald v. Commissioner,T.C. Memo. 1987-448↩. We treat the matter as conceded. 19. As in effect during 1981, section 1375 in part provided as follows: (d) DISTRIBUTIONS OF UNDISTRIBUTED TAXABLE INCOME PREVIOUSLY TAXED TO SHAREHOLDERS. -- (1) DISTRIBUTIONS NOT CONSIDERED AS DIVIDENDS. -- An electing small business corporation may distribute, in accordance with regulations prescribed by the Secretary, to any shareholder all or any portion of the shareholder's net share of the corporation's undistributed taxable income for taxable years prior to the taxable year in which such distribution is made. Any such distribution shall, for purposes of this chapter, be considered a distribution which is not a dividend, but the earnings and profits of the corporation shall not be reduced by reason of any such distribution. * * * (f) DISTRIBUTIONS WITHIN 2 1/2-MONTH PERIOD AFTER CLOSE OF TAXABLE YEAR. -- (1) DISTRIBUTIONS CONSIDERED AS DISTRIBUTIONS OF UNDISTRIBUTED TAXABLE INCOME. -- Any distribution of money made by a corporation after the close of a taxable year with respect to which it was an electing small business corporation and on or before the 15th day of the third month following the close of such taxable year to a person who was a shareholder of such corporation at the close of such taxable year shall be treated as a distribution of the corporation's undistributed taxable income for such year, to the extent such distribution (when added to the sum of all prior distributions of money made to such person by such corporation following the close of such year) does not exceed such person's share of the corporation's undistributed taxable income for such year. Any distribution so treated shall, for purposes of this chapter, be considered a distribution which is not a dividend, and the earnings and profits of the corporation shall not be reduced by reason of such distribution.↩
20. To this same effect, see Oswald v. Commisioner,T.C. Memo. 1987-448 (quoting Goodale v. Commissioner,T.C. Memo. 1981-317); Note, "'Locked-In Earnings' -- How Serious a Problem Under Subchapter S?," 49 Va. L. Rev. 1516, 1526-1530↩ (1963).
21. See also Bay Ridge Operating Co. v. Commissioner,T.C. Memo. 1970-19↩.
22. The actual checks written comport with proportional dividends, and additional $ 50,000 dividends to only each of the Strothmans would make the dividend non-proportional. Such a nonproportional dividend, however, may be made with the assent of all shareholders. Dudley v. Commissioner,32 T.C. 564, 589 (1959), affd. per curiam 279 F.2d 219 (2d Cir. 1960); James Goodnow & Co. v. Commissioner,5 B.T.A. 1154, 1158 (1927); 11 Fletcher, Cyclopedia of the Law of Private Corporations, sec. 5352, p. 848 (1986 perm. ed.) (a source often cited as authority by the North Dakota Supreme Court, e.g., Jablonsky v. Klemm,377 N.W.2d 560, 563 (N.D. 1985); Airvator, Inc. v. Turtle Mountain Manufacturing Co.,329 N.W.2d 596, 604↩ (N.D. 1983)).
23. The checks drawn to the Strothmans bear bank cancellation marks of "10-26-81" and "10-27-81," indicating to us that the Strothmans received their checks on the day of the meeting.↩
24. For the distribution to be taxable as a dividend, Inland's earnings and profits must have been at least $ 100,000 in the year ending August 31, 1982. See secs. 301(c) and 316↩.
25. The expiration dates of the underlying leases ranged from April 30, 1983, to May 31, 1985.↩
26. No such promissory notes ever were executed by Lease Pro because of Lease Pro's subsequent assignment to Finalco of notes owed to it by petitioners. See p. 50, infra.↩
27. This is in contrast to the one page agreements, which stated that petitioners would be entitled to such additional net rentals only after the 72nd month of the lease term.↩
28. The stated interest rate on the Finalco/Lease Pro notes was 12 percent, and the rates on petitioners' notes were 12.1214 percent (Strothmans), 12.1327 percent (Mosers), and 12.1333 percent (Bahmillers).↩
29. The underlying leases apparently were still with Pershing, except for one item of the Mosers' equipment which had been released to E-Systems, Inc.↩
*. The 1983 taxable years of the Mosers and Bahmillers are not in issue in the instant case.↩
30. B & A Distributing Co. v. Commissioner,T.C. Memo. 1988-589↩.
31. Our conclusion is not changed by the fact that the premium for the Strothmans' equipment is approximately 16 percent when compared to Mr. Lyons' estimate of value (and the Mosers' and Bahmillers' premiums are approximately 8 percent and 9 percent, respectively). The Strothmans' 16 percent premium (taking Mr. Lyons' value as correct) is not materially in excess of the generally accepted lease premium range noted by Mr. Lyons.↩
32. Similar analyses were set forth in Larsen v. Commissioner, 87 T.C. at 1263-1264 n.22; Casebeer v. Commissioner,T.C. Memo. 1987-628 n.14; Moore v. Commissioner,T.C. Memo. 1987-626 n.22; and Sturm v. Commissioner,T.C. Memo. 1987-625↩ n.24. 33. Although our focus is on the situation existing at the time petitioners entered into the transactions, a hindsight examination of actual results as of the date of trial indicates the estimated re-lease amounts are not unreasonable. Petitioners' shares of re-lease proceeds for the first 21 months in which they were entitled to additional rents are approximately $ 25,433 (Strothmans), $ 4,599 (Mosers), and $ 3,837 (Bahmillers). Extrapolation of those 21-month results to a 36-month period leads to re-lease receipts of approximately $ 43,600 (Strothmans), $ 7,900 (Mosers), and $ 6,600 (Bahmillers), and such 36-month amounts are sufficient to provide petitioners with economic profit on the transactions if the equipment's residual value at December 1989 is at least equal to the projected residual value we found above. We also note that we have seen nothing in the record to indicate that the Pershing equipment might not generate re-lease receipts for petitioners even after the end of the 36-month period.↩
34. The difference between the purchase price attributable to the C.I.T. note ($ 766,413) and the principal balance on the C.I.T. note that would have been outstanding as of that date ($ 764,550 by our calculation) is less than $ 2,000, an amount we consider immaterial. ↩
35. If the principal portion of the payment due January 1, 1982, on the C.I.T. note were allocated throughout the month of December 1981, the principal balance of the note would be approximately $ 707,000 as of December 8, 1981.↩
36. Accord Van Roekel v. Commissioner,T.C. Memo. 1989-74↩.
37. B & A Distributing Co. v. Commissioner,T.C. Memo. 1988-589↩. 38. We appreciate that the total original principal balances of petitioners' Limited Recourse notes ($ 733,076) exceeded the C.I.T. note's apparent principal balance (approximately $ 712,000) at the date of petitioners' acquisition of the equipment. Nevertheless, the fact that the payments owed on the Limited Recourse notes exactly offset the fixed rent payments owed by Finalco leads us to find, on these facts, that petitioners were not at risk during the year at issue for any portion of the Limited Recourse notes.↩
39. Respondent's arguments implicitly acknowledge that Lease Pro had no continuing interest in the computer activity other than as a creditor, so a finding that Lease Pro's interposition into the transactions should be respected (i.e., that it was not a strawman) would result in a conclusion that petitioners' notes were owed to a creditor not having any interest prohibited under section 465(b)(3). See Levy v. Commissioner,91 T.C. 838, 866-867↩ (1988). 40. Cf. Shriver v. Commissioner,T.C. Memo. 1987-627 n.13, and Moore v. Commissioner,T.C. Memo. 1987-626 n.14, where the Court, without addressing any at-risk issues, stated, Although not material to our determination of economic substance, we are impelled to find that Lease Pro served no legitimate business purpose in the transaction and was inserted into the chain of title by Finalco solely for tax considerations. See Bussing v. Commissioner,88 T.C. 449 (1987), supplemental opinion; 89 T.C. [1050 (1987)]; Coleman v. Commissioner,87 T.C. 178, 206 (1986), affd. per curiam 833 F.2d 303 (3d Cir. 1987); Tolwinsky v. Commissioner,86 T.C. 1009↩ (1986).
41. Respondent also asserts that a non-creditor right retained by Finalco was the right to receive a 10 percent fee for remarketing the equipment; however, the record contains no evidence to indicate that Finalco ever possessed such a right with respect to the Pershing equipment. Finalco did possess the right to such a 10-percent fee in transactions with other investors, e.g., those in Larsen v. Commissioner,89 T.C. at 1241↩. 42. In relevant part, that provision states, (b) Loans for which the borrower is personally liable for repayment -- (1) General rule. If a borrower is personally liable for the repayment of a loan for use in an activity, the lender shall be considered a person with an interest in the activity other than that of a creditor only if the lender has either a capital interest in the activity or an interest in the net profits of the activity. (2) Capital interest. For the purposes of this section a capital interest in an activity means an interest in the assets of the activity which is distributable to the owner of the capital interest upon the liquidation of the activity. The partners of a partnership and the shareholders of a corporation described in section 1371(b) are considered to have capital interests in the activities conducted by the partnership or corporation. (3) Interest in net profits.↩ For the purposes of this section it is not necessary for a person to have any incidents of ownership in the activity in order to have an interest in the net profits of the activity. For example, an employee or independent contractor any part of whose compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity.
43. See Ridgway v. Commissioner,T.C. Memo. 1989-18↩ (same result under New Jersey law).
44. Our holding also negates respondent's contention that petitioners were not at risk for their cash downpayments paid into the escrow account when they signed the one-page agreements. Petitioners' acquisition of the equipment was concomitant with their loss of the right to have those downpayments refunded.↩
45. Section 6661↩ applies to tax years for which the return's due date is after December 31, 1982. Pub. L. 97-248, sec. 323(a), 96 Stat. 324. The Strothmans' 1982 and 1983 tax years are thus subject to its provisions.